**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Francis William HEWES, II, Gene M. Simpson, Millard Clifford Haley, Walter Langford, and Howard E. Caldwell, Defendants-Appellants.**

No. 82–8004.

United States Court of Appeals,
Eleventh Circuit.

April 16, 1984.

Rehearings and Rehearing En Banc
Denied May 22, 1984.

Larry H. Chesin, Atlanta, Ga., for Hewes.

Michael C. Ford, Atlanta, Ga. (Court Appointed), for Simpson.

Federal Defender Program, Inc., Robert Altman, Atlanta, Ga., for Langford.

John O. Ellis, Atlanta, Ga. (Court Appointed), for Haley and Caldwell.

Samuel M. Forstein, Donald A. Purdy, Jr., Asst. U.S. Attys., Philadelphia, Pa., for plaintiff-appellee.

Before VANCE and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

JOHNSON, Circuit Judge:

On February 12, 1980, a federal grand jury in the Eastern District of Pennsylvania returned a fifty-two count indictment against the appellants, Francis William Hewes, II, Millard Clifford Haley, Howard E. Caldwell, Gene M. Simpson, and Walter Langford, as well as seventeen others. The indictment charged the named defendants with conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity ("RICO conspiracy"), 18 U.S.C.A. § 1962(d), violation of the RICO statute's substantive provisions, 18 U.S.C.A. § 1962(c), numerous counts of mail and wire fraud, 18 U.S.C.A. §§ 1341 and 1343, and interstate transportation of stolen property, 18 U.S.C.A. § 2314.

On January 7, 1981, the district court granted a change of venue for the five appellants plus Charles Caldwell and William Brooks, and it transferred the case to the United States District Court for the Northern District of Georgia. The trial began on August 19, 1981, and continued two months. After the court dismissed the thirty-three counts in which none of the defendants was named, the jury returned verdicts of guilty on all remaining counts against Haley, Hewes, Howard Caldwell, Brooks, Simpson, and Langford. The jury found Charles Caldwell, Howard's brother, not guilty of the two counts that remained against him. Haley, Howard E. Caldwell, and Hewes were all convicted of one count of violating RICO and one count of RICO conspiracy. Simpson and Langford were each convicted of one count of RICO conspiracy. In addition, Haley, Howard E. Caldwell, and Langford were convicted of seven counts of mail and wire fraud, Hewes was convicted of four counts of mail and wire fraud, and Simpson was convicted of two counts of mail fraud. Haley, Hewes, and Caldwell each received ten-year prison sentences, to run concurrently, for each of the RICO and RICO conspiracy convictions. Simpson received an eight-year prison sentence for his RICO conspiracy conviction; Langford received a six-year prison sentence for his. The court also sentenced the appellants to one-year prison terms, to be served consecutively, and to pay fines of $1000 on each of the mail and wire fraud counts. The court ordered that each of these one-year prison sentences was to be suspended upon payment of the fine for each count.

The appellants [1] attack their convictions and sentences on a number of grounds. They claim that: (1) the government failed to prove the existence of a RICO enterprise, (2) the trial court erred in admitting coconspirator hearsay statements, (3) the trial court erred in admitting evidence of similar acts, (4) the trial court's jury instructions were faulty, (5) the trial court erred in denying motions for severance, (6)

---

**1.** Defendant William Brooks died on February 4, 1982, and on July 7, 1982, this Court dismissed his appeal as moot.

the district court erred in rejecting the defendants' challenge to the composition of the petit jury array, (7) the evidence was insufficient to sustain certain mail and wire fraud convictions, (8) the mail and wire fraud sentences are unconstitutional, and (9) the trial court committed other miscellaneous errors, which collectively and individually mandate reversal of the convictions. The petit jury composition challenge we address in our opinion in *United States v. Tuttle*, 729 F.2d 1325. We reverse the convictions of appellants Caldwell and Langford on two counts of mail fraud. We affirm on all other issues.

## I. THE FACTS

### A. *The Nature of the Schemes*

The indictment charged the appellants with participating in a series of fraudulent "bustout" schemes. A bustout is a form of planned bankruptcy in which the operators of the bustout company attempt to obtain merchandise from manufacturers on credit and to defraud their trade creditors. The typical life-cycle of a bustout begins with the formation of a corporation and leasing of warehouse space. The bustout operators then attempt, through a variety of means, to obtain a favorable credit rating. They frequently open substantial checking accounts and prepare fraudulent financial statements to create a false impression of financial strength. They may create the illusion of significant inventories by borrowing merchandise from another bustout. On the basis of these appearances, the operators will attempt to obtain a positive Dun & Bradstreet rating. In addition, the bustout will develop a series of favorable credit references. Most commonly it accomplishes this by arranging for other bustout corporations to give potential creditors false information about prior extensions of credit to the subject bustout. A bustout may also buy some merchandise on credit, usually in small amounts, and pay for it. The bustout will then frequently employ that seller as a credit reference to obtain larger amounts of credit with other manufacturers, or will use its good history with the seller to escalate its line of credit with him.

Once the bustout is able to obtain goods on credit it begins purchasing as much of whatever type of merchandise as it can. Because the bustout operators do not intend to pay for these purchases, their primary concern is to sell the merchandise at whatever price it will bring, even if that is below cost. Frequently, the bustout will sell merchandise to auctioneers at substantially below the market price. Bustouts employ various means, including phoney burglary reports, to cover their shrinking inventories. In order to extend the life of a bustout, its operators will attempt to stall or "lull" creditors. One common technique is to sell the bustout company to a "take-down man" who attempts to mollify creditors by blaming non-payment on the previous owners and promising satisfaction. Finally, the take-down man will declare the bustout bankrupt or simply cease operations, remove the remaining inventory, and move on. Typically, this inventory serves as the seed for another bustout in a new location.

### B. *The Evidence*

Much of the evidence against the appellants came from seven of their coconspirators, Andrew Delosky, Ted Ferrell, Craig Cloninger, Thomas Chester, William Warner, Eugene Smith, and Rebecca Talalai, most of whom had pled guilty and awaited sentencing. The government also introduced the testimony of numerous "victim" creditors and sales representatives who had dealt with the bustout companies, as well as voluminous documentary evidence. The trial record fills forty volumes plus exhibits. The indictment alleged five bustouts, Continental Distributing Company, Travel Inn, Inc., Dart Distributing Company, Creative Sales, Inc., and Allied Imports, Inc., and the government introduced evidence concerning the defendants' participation in a number of other schemes before and during the time frame of the indict-

ment.[2] The mail and wire fraud counts alleged acts conducted in connection with the five bustouts named in the indictment. A detailed exposition of the evidence is unnecessary and would unduly lengthen an already ample opinion. A short description of some of the schemes about which evidence was given will provide a flavor of the alleged criminal activity.

One of the earliest of the fraudulent operations was Art Sales/Bonanza, which appellant Haley and Andrew Delosky started in 1972. Art Sales/Bonanza franchised first an art course and then recording tape distributorships. The company used many techniques common to bustouts to develop a strong credit rating and an appearance of legitimacy. Haley and Delosky sold franchises for substantial amounts of money with the intent to shut down their company, rendering the franchises worthless. Appellant Hewes was brought into the company to "take it down." Hewes first bought out Delosky's interest in Art Sales/Bonanza and then, after running the company with Haley for a period, bought Haley's share for one dollar. At about this time, appellant Caldwell was starting another franchising scheme called Allied Productions along with appellant Simpson. Haley and Hewes referred some potential franchisees to this new company.

In mid-1974, Delosky and Ted Ferrell established Ferhoff Distributors in Atlanta, which they ran as a bustout. In April of the next year they brought Haley into the company as a take-down man. Haley in turn brought Hewes and Simpson to Ferhoff for a short time. Ferrell told Hewes that Ferhoff was a bustout. In August 1975, Ferrell, Haley, and Rebecca Talalai simply closed up the Ferhoff premises, loaded the remaining inventory onto a van, and left town to establish another bustout. After examining the possibility of starting a new company in several different cities, the three settled on Birmingham, Alabama. There they founded Continental Distributing Company, which they incorporated in October 1975. The three prepared a false

financial statement and retained an accountant to prepare a more detailed, but unaudited statement. They then altered this statement by removing warnings that it was unaudited and that the inventory figures it contained were unverified. They provided copies of the altered financial statement to a number of suppliers from whom they desired credit and to Dun & Bradstreet. All three operators adopted aliases when dealing with creditors. They lined up a number of false credit references, which they provided to various manufacturers to obtain credit. They paid for some of their initial orders, but the majority of creditors went unsatisfied. Continental sold most of its merchandise at considerable discounts, sometimes approaching 50 percent below wholesale cost.

About the same time that Haley, Ferrell, and Talalai founded Continental, appellants Simpson and Caldwell bought out a Birmingham company called Travel Inn, Inc. for $10,000. Prior to this buy-out, Travel Inn had purchased merchandise on credit for appellant Hewes, who still owed several thousand dollars for it. Simpson paid for Travel Inn in merchandise from the company's inventory. Simpson and Caldwell prepared a false financial statement for Travel Inn and forged the signature of an accountant. Travel Inn submitted this financial statement, as well as a number of phoney credit references, to various potential creditors. Simpson and Caldwell developed close connections to the Continental group. The two companies provided each other with false credit references. Caldwell and Simpson negotiated with Ferrell the prosecution of a phoney law suit by Travel Inn against Ferhoff, Ferrell's old company. Travel Inn intended to obtain a false judgment against Ferhoff, which it could claim on its books to cover for the shrinkage of its inventory.

In the fall of 1975, Travel Inn and Continental began, under the direction of William Brooks, Travel Inn's attorney, to explore the possibility of a merger. A merger was seen as a lulling technique, similar

---

**2.** The acts alleged in the indictment occurred between January 1974 and January 1981.

to sale of the company, by which the operators hoped they could stall creditors. The parties agreed that the two companies would consolidate under the name Rekcus, which spells "sucker" backwards, and that they would send the new company into bankruptcy. At the beginning of 1976, Haley sold Continental to Simpson for one dollar. The real consideration for the sale was that Haley, Ferrell, and Talalai were permitted to raid Continental's inventory. Soon after the sale, Simpson brought appellant Langford into Continental as an employee. Ferrell gave Langford a list of creditors who were likely to call and told him about the alias he had used in dealing with them. While at Continental, Langford handled creditors, placed credit orders for merchandise that was never paid for, and participated in sales of merchandise at cutrate prices. In March 1976, Travel Inn and Continental merged under the name Rekcus and moved to Atlanta. Simpson sent letters to creditors on March 16, 1976, informing them of the merger. Within a few days, one of the creditors, Fram Corporation, forced the new company into involuntary bankruptcy. Rekcus's records showed "debts" owed it of $24,000 by Ferhoff Distributing from a judgment dated December 30, 1975, and $8,500 from Dart Distributing, a Hewes company. When Rekcus went bankrupt it owed creditors nearly half a million dollars.

Appellant Hewes started Dart Distributing Company in October 1975. Hewes retained an accountant, Craig Cloninger, to prepare articles of incorporation and a financial statement for Dart. Hewes told Cloninger that Dart would be a bustout and that Hewes had been involved in previous bustout operations. Hewes supplied Cloninger with unverified information, including some inflated figures for assets, on which to base the financial statements. In January 1976, Hewes hired Eugene Smith as sales manager for Dart after informing him that the company was to be a bustout. Smith had worked for Hewes twice before, once at Art Sales/Bonanza, and had been employed by Caldwell at Allied Productions. Hewes showed Smith how to line up false credit references and to prepare false financial statements. Hewes gave or received false credit references from a number of other bustouts in which other of the appellants were involved. Dart bought a variety of items from a number of companies on credit without ever paying its creditors. Hewes assisted Smith in forming his own bustout company called Reachout International. Hewes provided Smith with $8000 to help him obtain credit; Smith was required to return the money within a short time. In October 1976, Hewes sold Dart to John Craver to be taken down. Dart went into involuntary bankruptcy in March 1977 owing $1.1 million in unsecured claims; its creditors received 1.5 cents on the dollar.

After a brief association with a company called Decor Manufacturing, the intrepid team of Haley, Ferrell and Talalai in May 1976 created a new bustout in Atlanta called Creative Sales, Inc. The three obtained office space and worked up a false financial statement. Haley arranged with Hewes to borrow some antifreeze for inventory to create the appearance that Creative Sales owned assets. Creative Sales obtained a number of false credit references from other bustouts and on the basis of these, the fraudulent financial statement, and the borrowed inventory, obtained a favorable credit rating from Dun & Bradstreet. Creative Sales then began to purchase large amounts of merchandise on credit on the basis of its Dun & Bradstreet rating and various false credit references. It sold these goods at prices well below wholesale price to auctioneers and others. Haley brought Thomas Chester, who had previously worked for Howard Caldwell at Allied Productions, into Creative Sales to act as take-down man. Haley told Chester that Creative Sales was a bustout. Haley, Ferrell, and Talalai, after selling the company to Chester showed him how to take it down and to report a false burglary in order to explain shrinking inventories. Haley, Ferrell, and Talalai moved on to operate two more short-lived bustouts, Operational Sales and Pioneer Marketing, in late 1976 and 1977. These companies ex-

changed phoney credit references with Allied Imports, a Langford/Caldwell operation, and Telefax, a Hewes company.

Langford and Howard Caldwell founded Allied Imports in November 1976 in Atlanta. Allied purchased merchandise from manufacturers on credit for which it never paid. Allied received false credit references from Creative Sales, Operations Sales, Pioneer Marketing, Dart, Telefax, and Mark Steel, a company owned by Caldwell's brother. Allied also sold goods to a buyer for auctions at discount prices.

## II. RICO ENTERPRISE

The appellants claim that the government's evidence failed to prove the existence of a RICO "enterprise" as defined by 18 U.S.C.A. § 1961(4).[3] The appellants rely primarily on *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), in which the Supreme Court indicated that the existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." The appellants also cite *United States v. Bledsoe*, 674 F.2d 647, 665 (8th Cir.1982), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1983), in which the Eighth Circuit held that a RICO enterprise must possess an "ascertainable structure" distinct from the associations necessary to conduct the pattern of racketeering activity. The appellants claim that this authority requires the government to prove that an alleged enterprise possesses two characteristics: (1) participation of all the members of the enterprise throughout its life, and (2) a definable structure distinct from the "racketeering activity." They argue that the government failed to meet its burden.

■ The precedent of this Circuit makes clear that neither of these components is an essential element of a RICO enterprise. Our leading case remains *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).[4] There the Court stated that

> "enterprise" includes an informal, de facto association .... In defining "enterprise", Congress made clear that the statute extended beyond conventional business organizations to reach *"any ... group of individuals"* whose association, however loose or informal, furnishes a vehicle for the commission of two or more predicate crimes.... There is no distinction, for "enterprise" purposes, between a duly formed corporation that elects officers and holds annual meetings and an amoeba-like infra-structure that controls a secret criminal network.

*Id.* at 898. The appellants' argument implies that *Turkette* has overruled this holding. This Court has recently rejected that assertion. In *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983), we stated that *"Turkette* does not prevent this Court from adhering to *Elliot* [*Elliott*]."* We pointed out that *"Turkette* did not suggest that the enterprise must have a distinct, formalized structure. Instead, the Supreme Court noted that the organization may be formal or informal."* *Id.* The *Cagnina* Court also rejected the holding of cases such as *Bledsoe, supra,* that a RICO enterprise must possess an "ascertainable structure." *Id.* The Court held that a "group of persons who had committed a variety of unrelated offenses with no agreement as to any particular crime could be convicted of a RICO offense, because they were associated for the purpose of making money from repeated criminal activity." *Id.* at 920–21. Finally, the *Cagnina* Court implicitly rejected the contention that *Turkette's* reference to the

---

**3.** "[E]nterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4).

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit has adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, which is binding unless and until overruled or modified by this Court en banc.

enterprise as a "continuing unit" requires participation of all of its members throughout the life of the enterprise. "Although the evidence did not show that every member of the enterprise participated in or knew about all its activities, such evidence was not necessary to prove the existence of the enterprise." *Id.* at 922. Our precedent indicates that a RICO enterprise exists where a group of persons associates, formally or informally, with the purpose of conducting illegal activity.

■ We then must turn to the question whether the evidence supported the jury's conclusion that, in the words of *Elliott,* an "informal, de facto association" existed among the defendants that united them in the common purpose of making money from repeated criminal activity. In considering this issue we are bound to view the evidence in the light most favorable to the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). So viewed, the evidence provides ample support for the jury's conclusion. Evidence indicated that the series of bustout schemes as well as the associations among the defendants began at least in the early 1970's and continued for many years. During this time various of the defendants operated at least a dozen bustouts. The participants in these schemes overlapped to a significant degree. Appellants Haley and Hewes ran Art Sales/Bonanza together in the early 1970's along with Andrew Delosky; the three later admitted Howard Caldwell as a partner. Caldwell joined with appellant Simpson to operate Allied Productions, and they hired Gene Smith, an Art Sales/Bonanza employee, on the recommendation of Hewes. The Ferhoff bustout was operated by Delosky and Ted Ferrell, who brought in Haley to oversee the "take down." Both Simpson and Hewes were on the Ferhoff payroll. Continental Distributing was run by Ferrell, Haley, and Rebecca Talalai; appellant Langford dealt with Continental's creditors. Simpson bought the company when it merged with Travel Inn to form Rekcus. Caldwell and Simpson were the major promoters of the Travel Inn bustout. Haley and Hewes were both involved in the transactions that led to Travel Inn's merger with Continental. The company subsequently formed, Rekcus, had as directors Caldwell, Haley, Langford, and Simpson. Hewes and Smith teamed up to begin Dart Distributing, and later to form Reachout. Ferrell, Haley, and Talalai were all directors of Creative Sales, and Hewes and Smith provided that company merchandise from Dart's inventory to help it get started. In the meantime, Caldwell and Langford had formed another company, Allied Imports.

The jury's conclusion that these shifting associations formed an "enterprise" is bolstered by the network of mutual, fraudulent credit references that existed among and helped support the various bustout companies. Continental Distributing exchanged fraudulent credit references with Travel Inn, Dart Distributing, and Reachout. Dart also exchanged references with Allied Imports and Reachout and gave a reference for Creative Sales. In addition to Dart, Allied Imports received references from Operational Sales and Pioneer Marketing, Creative Sales, and Telefax, another Hewes company. The companies helped each other expand credit in other ways. Dart lent Creative Sales merchandise from its inventory so that Dun & Bradstreet's representative would believe that Creative had assets. The Travel Inn directors arranged to boost their recorded assets by obtaining a phoney judgment against Ferhoff. Travel Inn and Continental Distributing used a merger as a device to lull creditors. On a number of occasions merchandise was transfused from one of the elderly bustouts, which was ready to fold, to a younger, vigorous company that needed the inventory to develop a good credit rating. The pattern of reciprocal credit references was essential to each of the bustouts because it enhanced the bustouts' ability to buy on credit, without which the schemes could not have succeeded. These facts allowed the jury to find a RICO enterprise in that there existed an informal, de facto association dedicated to the purpose of maintaining a network of interdependent

fraud schemes. "The evidence in this case demonstrated the existence of an enterprise—a myriapod criminal network, loosely connected but connected nonetheless." *Elliott,* 571 F.2d at 899.

## III. COCONSPIRATOR HEARSAY

The defendants filed pretrial motions requesting a hearing pursuant to *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). They requested that the government be required to prove, as a prerequisite to introduction of coconspirator hearsay statements at trial, that (1) a conspiracy existed, (2) the coconspirator and the defendant against whom the statement was offered were members of the conspiracy, and (3) the statement was made during the course of and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E).[5] The district court denied the motions, indicating that it would admit the statements subject to later proof of these three elements. The appellants contend that the trial court erred in refusing to conduct a *James* hearing.

■ The appellants have succumbed to a common misunderstanding of *James.* Despite the clear language of *James* and this Court's repeated explanations during the five years since the decision was rendered, criminal appellants continue to fall victim to the same analytical error. *"James* ... suggests that a pretrial or *in camera* proceeding is the *best* way to handle a coconspirator hearsay question, but it clearly does not establish that this is the *only* way to do so." *United States v. Walker,* 720 F.2d 1527 at 1537 (11th Cir.1983). If the trial court determines that such a proceeding is not "reasonably practical" it has discretion to "admit the statement subject to being connected up," *James,* 590 F.2d at 582, that is, subject to proof during the

course of the trial of the three Rule 801(d)(2)(E) requirements. If the defendant makes an appropriate motion at the close of the evidence, the trial court is obligated to determine whether the prosecution has carried its burden under the Rule. *Id.; Walker,* at 1537. If the trial court determines that the government has not met its burden of showing those three elements by a preponderance of the non-hearsay evidence, then the court must choose between (1) striking the evidence and giving a cautionary instruction, or (2) declaring a mistrial. *Id.; James,* 590 F.2d at 582–83.

■ The trial court complied with the requirements set out in *James.* The court did not abuse its discretion in deciding that a pretrial review of the voluminous non-hearsay evidence of conspiracy was impracticable.[6] Because the defendants filed no motion after the close of the evidence requesting that the court make a factual determination as to whether the government had met its burden as to the existence and scope of the conspiracy, the court was not required to make such a determination. *United States v. Bulman,* 667 F.2d 1374, 1380 (11th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); *United States v. Sutherland,* 656 F.2d 1181, 1199–200 n. 14 (5th Cir. Unit A 1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). Nevertheless, the court did require the government to submit a summary of all the non-hearsay evidence presented at trial that supported the common membership of the defendants and the alleged coconspirators in a RICO conspiracy. As the government's summary indicates, ample evidence existed for the trial court to find that the government had met its burden and that the coconspirator's hearsay statements were admissible.

---

**5.** "A statement is not hearsay if—... The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).

**6.** We reemphasize, however, the preferability of an *in camera* or pretrial hearing. Had the

government failed to "connect up" the hearsay statements it is likely that the court in this case would have been forced to declare a mistrial after many weeks of testimony. Such potential for waste of judicial resources should encourage courts to avoid the risks that attend failure to hold a *James* hearing.

■ The appellants also complain that the trial court did not properly limit the use of coconspirator hearsay. They initially contend that the evidence proved the existence of numerous Title 18, Section 371 conspiracies, all of which were parts of the larger RICO enterprise. Although the indictment charged the defendants with entering a RICO conspiracy, they maintain that the trial court should have admitted hearsay statements only against the declarant's Section 371 coconspirators and only for the purpose of proving the defendant's participation in each of the individual Section 371 conspiracies that formed the larger RICO conspiracy. In other words, the appellants contend that the court should not have admitted one RICO conspirator's hearsay statements against another unless the two coconspirators were members of the same Section 371 conspiracy. Essentially, this is an argument that Fed.R.Evid. 801(d)(2)(E)'s exception of coconspirators' hearsay statements from the definition of hearsay does not include statements of RICO coconspirators made in the course of RICO conspiracies. We reject this claim.

Fed.R.Evid. 801(d)(2)(E) excepts from the Federal Rules definition of hearsay "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The terms of neither the Rule nor 18 U.S.C.A. § 1962(d), the RICO conspiracy statute, exclude from this exception statements made in furtherance of a RICO conspiracy. No authority supports the proposition that the term "conspiracy" as employed in Rule 801(d)(2)(E) was for some reason intended to include all conspiracies except RICO conspiracies. On the other hand, this Court has frequently held RICO coconspirators' statements admissible under the rule. *See, e.g., United States v. Carter*, 721 F.2d 1514 at 1514 (11th Cir.1984); *Cagnina*, 697 F.2d at 922. We have recently emphasized in a different context that except for the creation of a new objective, violation of a substantive RICO provision, Congress did not alter traditional conspiracy principles in enacting Section 1962(d), *Carter* at 1528–1529; thus, exclusion of statements made in furtherance of a RICO conspiracy from the 801(d)(2)(E) exception would have no theoretical basis. We conclude, therefore, that where, as here, the government has demonstrated by a preponderance of the evidence that a RICO conspiracy existed, that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the RICO conspiracy, and that the statement was made during the course and in furtherance of the RICO conspiracy, the coconspirator's statements are not hearsay. The mere fact that the defendant and the coconspirator may not have been members of the same Section 371 conspiracies which collectively form the RICO enterprise is irrelevant. Consequently, the government had met all the requirements of Rule 801(d)(2)(E), and the trial court properly admitted the statements.

## IV. INTRODUCTION OF EVIDENCE OF EXTRINSIC ACTS

At the trial, the district court permitted the government to introduce evidence of a number of fraudulent schemes not mentioned in the indictment. Most of these preceded the events alleged in the indictment.[7] Some of this "extrinsic act" evidence related to bustout schemes. Other evidence related to franchising schemes such as Art Sales/Bonanza. The appellants claim that introduction of this evidence violated Fed.R.Evid. 404(b)[8] in that it was evidence of extrinsic acts relevant only to character of the defendants. Alternatively, they argue that the trial court's admission of the extrinsic act evidence vio-

---

7. *See* note 2, *supra.*

8. (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Fed.R.Evid. 404(b).

lated Fed.R.Evid. 403 [9] in that its probative value was substantially outweighed by its prejudicial effect on the defendants. We reject these claims.

In the leading case of *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir. 1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), the Fifth Circuit laid out the principles that guide a decision whether to admit evidence of extrinsic acts. We have recently recognized *Beechum* as establishing a two-part test:

> Extrinsic offense evidence is admissible only if (1) the evidence is relevant to an issue other than the defendant's character, and (2) the probative value of the evidence is not substantially outweighed by undue prejudice.

*United States v. Roe,* 670 F.2d 956, 967 (11th Cir.1982), *cert. denied,* 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1983). The first part of the *Beechum-Roe* test is a Rule 404(b) inquiry—is the evidence prohibited by that rule because it is only relevant to the defendant's character. The second part of the test incorporates Rule 403—is the evidence, although relevant, inadmissible because its probative value is outweighed by its prejudicial effect. Although Rule 403 applies to all evidence, not just evidence of extrinsic crimes, we make it an explicit part of the test for introduction of extrinsic act evidence out of recognition that such evidence has a great potential to prejudice the defendant but limited potential for probity. The decision whether to admit extrinsic offense evidence rests in the sound discretion of the trial court, and an appellate court may reverse that decision only if it constituted a clear abuse of discretion. *United States v. Tunsil,* 672 F.2d 879, 880 (11th Cir.1982), *cert. denied,*

459 U.S. 850, 103 S.Ct. 110, 74 L.Ed.2d 98 (1983).

The nature of the inquiry that the first prong of the *Beechum-Roe* test requires depends on the issue to which the government claims the extrinsic evidence is relevant. *See Beechum,* 582 F.2d at 911–12 n. 15. Most commonly, the prosecution seeks to introduce extrinsic act evidence as proof of criminal intent. The test for relevancy to intent is therefore well defined.

> The first prong of *Beechum* can be satisfied if the evidence goes to the defendant's intent, the extrinsic offense requires the same intent as the charged offense, and the jury could find that the defendant committed the extrinsic offense.

*United States v. Mitchell,* 666 F.2d 1385, 1389 (11th Cir.1982), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1340 (1982). Because factual propositions such as whether the defendant committed the extrinsic offense are merely predicates to admissibility, they need not be proven beyond a reasonable doubt. *Id.* at 1389 n. 6; *Beechum,* 582 F.2d at 913; Fed.R.Evid. 104(b). We have generally held that, if the extrinsic acts are similar to the charged offense in that they require the same type of intent and if the extrinsic acts are fairly proximate in time to the charged offenses, then the extrinsic act evidence is highly probative on the issue of intent. *Mitchell,* 666 F.2d at 1390; *Tunsil,* 672 F.2d at 881; *United States v. Byers,* 600 F.2d 1130, 1133 (5th Cir.1979). The extrinsic act evidence that the government offered at trial as proof of criminal intent met these requirements. The extrinsic acts involved frauds identical to or quite similar to the bustouts charged in the indictments.[10] The

---

**9.** "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R.Evid. 403.

**10.** When asked whether the franchise and bustout schemes were similar, Andrew Delosky testified that they were and elaborated:

> Both businesses were set up in appearance as a front-type appearance. You got your credit rating built up early in the business, whether you were selling a franchise or you were taking goods in, you wanted to have good financial statements, you wanted to have credible people at its helm, you wanted to

extrinsic acts were also proximate in time in that they occurred from 1969 until a few months before the beginning of the first charged fraud. *See* note 2, *supra.* The defendants strongly disputed the issue of intent at trial, and the evidence of extrinsic acts was highly relevant to the jury's determination on that issue.[11]

The government also argues that the extrinsic act evidence was relevant to prove association among the defendants as such proof is necessary to make out the "enterprise" element of the RICO counts, to depict the plan of operation and show the defendants' experience and ability to execute such schemes, and to show the "genesis and formation of the conspiracy." We deem it sufficient to state that the extrinsic act evidence was relevant to all these issues as well as to criminal intent. The government has clearly satisfied the first prong of the *Beechum-Roe* test in showing that the extrinsic act evidence is relevant to an issue other than the character of the defendants.

The second prong of the test involves a weighing of the probative value of the ex-

trinsic evidence against its potential for prejudice. Although there was some potential for prejudice because of the similarity of the extrinsic and charged offenses, *see Beechum,* 582 F.2d at 915 n. 20, the extrinsic offenses were not of such a heinous nature that they were likely to incite the jury to an irrational decision. *Tunsil,* 672 F.2d at 881. Such irrationality is the primary target of Rule 403, and the possibility of prejudice we therefore consider slight. *See Beechum,* 582 F.2d at 915 n. 20. Moreover, the possibility of prejudice was mitigated in large part by the trial court's cautionary instruction,[12] which it repeated several times during the presentation of evidence and included in its charge to the jury. We must balance this slight possibility of prejudice against the probative value of the extrinsic act evidence. The appellants argue that even if the evidence was probative, as we concluded above, it had little *incremental* value because the government presented considerable evidence on the issues for which it was introduced. This contention is curious giv-

make a good impression to the public you were dealing with, whether it be to the franchisee who you were selling a franchise to, or to the sales rep you were buying merchandise from. You wanted both companies to be acceptable to whichever group you were dealing with. But the net result would be the same. The businesses would fold with either the creditors left being owed money or the individuals that had bought a franchise would be left with a franchise that was not working and the doors would be closed.

11. The extrinsic act evidence was relevant to this case in much the same way that the evidence was relevant in *Roe.* There the court stated that

[t]he government's purpose was only to show that the defendants had some prior knowledge and experience of how to run a business like Deltron, which was relevant to negate the defendants' argument that they were innocent bumblers.

670 F.2d at 967. Similarly, the defendants in the present case claimed that they were honest businessmen who had hit on a remarkable string of bad luck (evidence showed, for example, that appellant Haley was associated with eleven failed businesses in nine years). The extrinsic act evidence tended to refute that assertion by showing that the acts alleged in the

indictment were not merely isolated, individual business failures but were the components of a pattern of illegal activity.

12. In its charge to the jury the trial court stated:

Evidence that an act was done at one time, or on one occasion, is not any evidence or proof whatever that a similar act was done at another time, or on another occasion. That is to say, evidence that a Defendant may have committed an act similar to the acts alleged in the indictment may not be considered by the jury in determining whether the accused in fact committed any act charged in the indictment. If the jury should find beyond a reasonable doubt from other evidence in the case that the accused did the act charged in the particular count under deliberation, then the jury may consider evidence as to an alleged act of a like nature, in determining the state of mind or intent with which the accused did the act charged in the particular count. And where proof of an alleged act of a like nature is established by evidence which is clear and conclusive, the jury may, but is not obliged to, draw the inference and find that, in doing the act charged in the particular count under deliberation, the accused acted willfully, and not because of mistake or accident or another innocent reason.

en that the appellants strongly contested those issues at trial and now argue that there was insufficient evidence to support the jury's verdict on two of them, intent and association among the defendants. We hold, therefore, that the trial court did not abuse its discretion in admitting the evidence of extrinsic offenses.

## V. THE TRIAL COURT'S JURY INSTRUCTIONS

▆▆▆ At the close of the evidence, the trial court instructed the jury both orally and in writing.[13] Due to the complexity of the case, the instructions were involved; the written instructions cover some forty pages. The appellants attack the instructions as containing a number of fatal errors. In reviewing the sufficiency of jury instructions, the appellate court must examine the entire charge to determine whether, taken as a whole, it adequately presented the issues and the law to the jurors. *United States v. Abravaya*, 616 F.2d 250, 251 (5th Cir.1980). "In assessing an appellant's claim, the trial court must be given broad discretion in wording the jury instructions and will not be reversed so long as the charge correctly states the substance of the law." *United States v. Sorrells*, 714 F.2d 1522, 1531 (11th Cir.1983).[14]

▆▆▆ The appellants first point out that the district court on several occasions told

the jury that it could convict if it was "satisfied" of the existence of certain elements, in particular the existence of a conspiracy and an enterprise. The appellants claim that this led the jury to believe that the government was not required to prove these facts beyond a reasonable doubt. This assertion is meritless. The court repeatedly reminded the jurors that the government had to prove the elements of conspiracy and enterprise beyond a reasonable doubt. Taking the court's charge as a whole, it is clear that occasional use of the word "satisfied" did not mislead the jury as to the standard of proof required of the government.

The appellants further argue that the court did not sufficiently define the term "enterprise." In explaining the meaning of the term, the court quoted the statutory language.[15] The appellants argue that this was insufficient; in particular it failed to indicate to the jury the necessity of finding that all the defendants be associated with the enterprise throughout its life. Given the difficulty that courts have encountered in determining the scope of the RICO enterprise requirement, it is true that it would be preferable for trial courts to flesh out the bare words of the statute.[16] In this case the court did so. The charge described the particular enterprise that the government charged in the indictment.[17]

**13.** The appellants argue that the practice of submitting a written charge to the jury is itself error that requires reversal of their convictions. Our precedent has criticized this procedure but has not held it to constitute error standing alone. In *United States v. Schilleci*, 545 F.2d 519, 526 (5th Cir.1977), the Court stated that "[w]hile not error in itself, the practice is conducive to dissection of the charge by the jury and over-emphasis of isolated parts rather than consideration of the charge as a whole." *Id.* More recently, this Court has held that it is not error to provide the jury with a videotape of the charge that contains an explicit admonition that the jurors consider the charge as a whole. *United States v. Watson*, 669 F.2d 1374, 1385–86 (11th Cir.1982). In this case the trial court told the jury that it was obligated to consider the charge as a whole and not to "disregard or give special attention to any one instruction." We conclude, therefore, that the trial court did not err in presenting the jury with written instructions.

**14.** The deference we pay the trial court's wording of its instructions is important in this case. The appellants tend to base their attacks on the failure of the district court to define various statutory terms in the exact words employed by other courts. Such claims are insufficient.

**15.** *See* note 3, *supra.*

**16.** We express no opinion as to whether merely repeating the statutory definition is legally sufficient.

**17.** The court told the jurors:

The government contends that the enterprise charged in the indictment is that a group of individuals, comprised of defendants … along with others … by and through companies owned, operated and otherwise controlled by them formed a network of individuals who operated and who assisted each other and third parties to operate fraudulent busi-

The court instructed that, in order to convict on the RICO counts, the jury had to find that the enterprise charged in the indictment in fact existed. It also instructed that "proof of several separate enterprises, should there be such, is not proof of the single overall enterprise charged in the indictment." We have already held that the network of bustout companies charged in the indictment and described by the district court in its instructions constitutes a RICO enterprise. If the jury found that such a network existed, then a RICO enterprise existed. Given these instructions, there was no need for further explication of the meaning of the word "enterprise." The law does not require all members of the RICO enterprise to have maintained their association with it throughout the enterprise's life, *see* part II, *supra*, so the trial court's failure to instruct the jury to that effect was not error.

The appellants also contend that the court failed in defining a "pattern of racketeering activity" to instruct the jurors that such activity must be conducted in furtherance of the affairs of the enterprise. This ignores the court's instruction that the fourth element of the substantive RICO count required the government to prove that "through the commission of the two or more connected offenses, the Defendant conducted or participated in the conduct of the 'enterprise's' affairs." The appellants also contend that the district court erred in failing to instruct the jurors that each of the defendants, in order to be convicted of RICO conspiracy, must have joined the conspiracy by agreeing to commit two predicate acts. We have recently held that when "a defendant agreed to participate in the conduct of an enterprise's affairs with the objective of violating a substantive RICO provision, it is not necessary that the defendant agree to personally commit two predicate acts for the required pattern of

racketeering activity." *Carter, supra,* at 1531.[18]

Finally, the appellants claim that the court's instruction limiting the use of extrinsic act evidence was insufficient. They point to a limiting instruction in which the court stated that evidence of extrinsic acts could be considered only to show "association, plan scheme, motive, intent, and state of mind, if any, on the part of the defendants." The appellants claim that use of the plural "defendants" could have led the jury to believe that the evidence was admissible against all the defendants and not just those who committed the extrinsic acts. This argument is also meritless. The court charged that

> [i]f the jury should find beyond a reasonable doubt from other evidence in the case that *the accused* did the act charged in the particular count under deliberation, then the jury may consider evidence as to an alleged act of a like nature, in determining the state of mind or intent with which *the accused* did the act charged in the particular count (emphasis supplied).

This instruction makes clear that the extrinsic act evidence could be considered as evidence of the state of mind only of the defendant who committed the extrinsic act.

Taken as a whole, the trial court's charge to the jury adequately instructed the jurors on the substance of the law they were required to apply. Consequently, the appellants' attempts to torture the meaning of the court's plain language, to highlight particular passages out of the context of the entire charge, and to point out instances where the court failed to employ the exact terminology of our opinions or those of the Supreme Court, are unavailing.

## VI. THE MOTIONS FOR SEVERANCE

Each of the appellants argues that he was misjoined under Fed.R.Crim.P. 8(b)[19]

---

nesses known as planned bankruptcies or "bustouts."

**18.** Moreover, even absent our holding in *Carter,* such an omission would be harmless error because each of the appellants was convicted of

committing two predicate acts in furtherance of the alleged enterprise.

**19.** Fed.R.Crim.P. 8(b) provides:
 Two or more defendants may be charged in the same indictment or information if they

and that the trial court abused its discretion in refusing to grant a severance under Fed.R.Crim.P. 14.[20]

### A. *Rule 8(b)*

■■■ Misjoinder of multiple defendants under Rule 8(b) is prejudicial *per se* and would require a new trial. *United States v. Kabbaby*, 672 F.2d 857, 860 (11th Cir.1982). In order to determine whether the requirements for joinder contained in Rule 8(b) are met, we must examine the face of the indictment; if its allegations, taken as true, establish participation of each defendant in a single conspiracy, joinder is proper under the rule.[21] *United States v. Russell*, 703 F.2d 1243, 1247 (11th Cir.1983). If the indictment charges participation in a single conspiracy, joinder is proper although the indictment also charges "some but not all of the defendants with substantive counts arising out of the conspiracy." *United States v. Phillips*, 664 F.2d 971, 1016 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).[22]

■■■ The allegation that all the defendants participated in a RICO conspiracy sufficiently linked the various defendants so

> are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

**20.** Fed.R.Crim.P. 14 provides:
> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

The appellants also claim that there existed a material variance between the indictment and the evidence that the government produced at

that the requirements of Rule 8(b) were met.

The allegation in the RICO conspiracy count was that the defendant[s] agreed to further a racketeering enterprise through a pattern of racketeering activity. The diverse parties were tied together through the overall scheme and the concept of the illegal enterprise. The overt acts and substantive predicate crimes that were alleged in the indictment to have furthered the pattern of racketeering were sufficiently connected that their interrelationship constituted an offense of a series of acts or transactions.

*Id.*

### B. *Rule 14*

■■■ Rule 14 requires trial courts to balance the right of defendants to a fair trial, absent from the prejudice that may result from joint trials, against the public's interest in efficient and economic administration of justice. *Phillips*, 664 F.2d at 1016. We will reverse a trial court's denial of severance under Rule 14 only for an abuse of discretion. *United States v. Russell*, 703 F.2d at 1247; *United States v. Harper*, 680 F.2d 731, 733 (11th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 229, 74

> trial. *E.g., United States v. Sutherland*, 656 F.2d 1181, 1189–95 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). The argument is merely a rephrasal of their challenge to the sufficiency of the evidence of a RICO enterprise, a challenge that we rejected above.

**21.** The appellants point out that we look beyond the indictment's allegations if the joinder "is based on improper legal interpretation or there are allegations of prosecutorial bad faith." *United States v. Kabbaby*, 672 F.2d at 860. They claim that the indictment is based on an improper interpretation of the scope of a RICO "enterprise"; we rejected this contention above. The appellants' charge of prosecutorial misconduct is frivolous; they neither cite evidence nor offer specific allegations of bad faith on the part of the government.

**22.** Decisions rendered after October 1, 1981, by a Former Fifth Circuit Unit B panel or en banc court are binding on this Court. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

L.Ed.2d 182 (1982); *Phillips,* 664 F.2d at 1016. This court has repeatedly stated that "[i]n order to demonstrate an abuse of discretion, the defendant must establish that the joint trial subjected him not just to some prejudice, but to compelling prejudice against which the district court could not afford protection." *Harper,* 680 F.2d at 733. The test for compelling prejudice is "whether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jury to follow the admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements, and conduct." *Kabbaby,* 672 F.2d at 861, *quoting United States v. Zicree,* 605 F.2d 1381, 1389 (5th Cir.1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). Standing alone, the mere fact that the defendant would have had a better chance of being acquitted if tried individually is not "compelling prejudice." *Kabbaby,* 672 F.2d at 861–62.

 Each of the defendants claims that he was prejudiced by the "spillover" of evidence introduced against his codefendants. In assessing such claims we often look to the jury's verdict. *See, e.g., Kabbaby,* 672 F.2d at 861; *Phillips,* 664 F.2d at 1017; *Zicree,* 605 F.2d at 1389. "Convictions will invariably be sustained if it may be inferred from the verdict that the jury 'meticulously sifted the evidence,' as where it acquits on certain counts." *Kabbaby,* 672 F.2d at 861. Here the jury returned a verdict of guilty against six defendants on all the counts that remained against them, but it found defendant Charles Caldwell not guilty of both the counts with which he was charged. The jury's ability to distinguish among the defendants in this manner indicates that it was able to determine the guilt of each individual based solely on his own acts, statements, and conduct. We hold, therefore, that the trial court did not abuse its discretion in denying the defendants' motions for severance.

 Appellant Howard Caldwell claims that the denial of a severance was particularly prejudicial to him because it prevented him from obtaining the beneficial testimony of several of his codefendants. He claims that Langford, who refused to testify in the joint trial, would have testified in a separate trial that Allied Imports was not run as a bustout and that Caldwell was merely an employee of that company and did not participate in its management except in an "advisory capacity." This Court and its predecessor have developed a rather detailed test for "compelling prejudice" when a Rule 14 movant asserts the need for codefendants' testimony:

> First, the defendant must demonstrate: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the codefendant will in fact testify if the cases are severed....
>
> If the defendant makes such a showing, the district court must: (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) assess the extent of prejudice caused by the absence of the testimony; (3) pay close attention to considerations of judicial economy; and (4) give weight to the timeliness of the motion.

*United States v. Duzac,* 622 F.2d 911, 912 (5th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980). Caldwell's claim falls short in several respects. First, the evidence is of doubtful exculpatory *effect.* Most of Langford's prospective testimony was merely a denial of criminal intent, the basic defense of all the defendants throughout the trial. The jury chose to reject this defense although three codefendants offered similar testimony. Evidence that Caldwell managed Allied Imports only in an "advisory capacity" would not do much to separate him from knowledge of the company's operations. Second, Langford's claim that he would testify in a separate trial is doubtful given that Caldwell has failed to show the reason why Langford would be willing to give this testimony at a separate trial but not at a joint one. "The usual reason for such a strategy is inconsistent or antagonistic defens-

es—the testimony that exonerates the movant will implicate the co-defendant witness." *United States v. Burke*, 495 F.2d 1226, 1234 (5th Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). But none of Langford's prospective testimony appears particularly self-incriminatory; most of it supports his own defense at the joint trial. Third, considerations of judicial economy strongly support the trial court's denial of severance. The joint trial was long and complicated, and separate trials would have required enormous duplication of effort. *Id.* Finally, the severance motion on which Caldwell relies was not timely. Caldwell moved for severance several times before and during the trial based on statements contained in his trial attorney's affidavit to the effect that codefendants might give exculpatory evidence if Caldwell was tried separately. As the magistrate and trial court found, these statements were far too conclusory to warrant a severance. Caldwell again requested a severance in a post-trial motion for a new trial, which was accompanied by a new, more detailed affidavit of his attorney on which he now relies. Without a showing that the motion is based on grounds not known before trial, a Rule 14 motion made after trial is not timely. *United States v. Butler*, 611 F.2d 1066, 1071 (5th Cir.), *cert. denied*, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980). For these reasons, the trial court was well within its discretion in denying Caldwell's post-trial motion for severance.

## VII. SUFFICIENCY OF THE EVIDENCE

Collectively, the appellants raise three distinguishable challenges to various of their convictions based on the sufficiency of the evidence adduced at trial. Appellants Haley, Caldwell, Simpson, and Langford challenge their convictions for mail fraud under Counts 5 and 6. Appellants

Caldwell and Langford challenge their mail fraud convictions under Counts 49 and 50. Appellant Hewes challenges all of his convictions. In reviewing such claims we must view the evidence in the light most favorable to the government and make all reasonable inferences in support of the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The verdict is sufficiently supported if, so viewed, the evidence would permit a reasonable trier of fact to conclude that the defendant is guilty beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *affirmed*, ─ U.S. ─, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

### A. *Counts 5 and 6*

Counts 5 and 6 charged appellants Haley, Caldwell, Simpson, and Langford with violations of 18 U.S.C.A. § 1341.[23] The fraudulent mailings the counts alleged were the so-called "Rekcus letters." These letters, dated March 16, 1976, and signed by Simpson, informed the creditors of Travel Inn, Inc., and Continental Distributors, Inc., that in an effort "to overcome severe financial reverses" the two companies were merging into a new corporation, Rekcus Consolidated. The letters gave Rekcus's address to which they instructed creditors to direct inquiries concerning Travel Inn or Continental.

The government must prove the existence of three elements to establish a violation of Section 1341: (1) The accused participated in a scheme or artifice to defraud; (2) The defendant "caused" a use of the mails; (3) The mailing was for the purpose of executing the scheme. *United States v. Toney*, 598 F.2d 1349, 1351 (5th Cir.1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). The appellants claim that the evidence did not

---

**23.** 18 U.S.C.A. § 1341 provides in pertinent part: Whoever, having devised or intending to devise any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice ... knowingly causes to be delivered by mail according to the direction thereon, or at

the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

show that the Rekcus letters were for the purpose of executing the fraudulent scheme. The government responds that the merger and letters announcing it were intended to "lull" creditors into giving the new company time to set itself right financially and thus buy more time for the bust-out.

In *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), the Supreme Court held that mailings may be fraudulent under Section 1341 even though made *after* the defendants had fraudulently obtained funds when "mailed by the defendants to the victims for the purpose of lulling them by assurances that the promised services would be performed." *Id.* at 81, 83 S.Ct. at 176. Such letters could be found to be "for the purpose of executing" the fraudulent scheme. In *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), the Court discussed the limits of the "lulling" concept. There the Court held that fraudulent use of a credit card does not constitute mail fraud merely because the merchant to whom the card was presented mailed the sales slips to the issuing bank. The Court concluded that the sales slip mailings had no "lulling" function as did the mailings in *Sampson;* instead, the mailings would tend to alert the cardholder to the theft of his card and increase "the probability that [the defendant] would be detected and apprehended." *Id.* at 403, 94 S.Ct. at 650. The appellants rely heavily on *Maze* in claiming that the Rekcus letters could not possibly have lulled creditors. They point out that the letters admitted the severe financial troubles of Travel Inn and Continental, they claim that the appellants' intention to send Rekcus into bankruptcy is inconsistent with the concept of lulling, and they assert that the letters had no lulling effect in fact because one creditor pushed Rekcus into involuntary bankruptcy immediately upon receiving its copy of the letters. These arguments are unpersuasive. "[P]ost-purchase mailings which are designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the scheme." *Toney*, 598 F.2d at 1353, *quoting United States v. Ashdown*, 509 F.2d 793, 800 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975). The jury could easily have found that these mailings were intended to mislead the creditors of the new Rekcus corporation about its intent to pay its debts. The letters explicitly stated that the purpose of the consolidation was "to overcome severe financial reverses," suggesting that if creditors gave the company a bit more time it would settle its accounts. The letters also made the merger, which the jury could have concluded was intended to insulate the owners of Travel Inn and Continental from their creditors and thereby further the aim of the fraudulent scheme, appear less suspicious by portraying Rekcus as a legitimate company. That the letters admitted the financial troubles of the predecessor corporations is immaterial—the recipients as unpaid creditors knew about these problems. The important aspect of the letters was the implicit promise they contained that Rekcus would pay its predecessors' debts. *See United States v. Habel*, 613 F.2d 1321, 1325 (5th Cir.), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). Finally, the failure of the letters actually to lull all of Rekcus's creditors does not relieve the appellants of criminal liability. Success of the fraudulent scheme is not an element of a Section 1341 offense. *United States v. Martino*, 648 F.2d 367, 399 (5th Cir.1981), *cert. denied*, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982); *Adjmi v. United States*, 346 F.2d 654, 657 (5th Cir.), *cert. denied*, 382 U.S. 823, 86 S.Ct. 54, 73, 15 L.Ed.2d 69 (1965).[24]

24. Langford claims that as a mere employee of Continental he was insufficiently connected to the mailings to have "caused" them to be made. He claims that the evidence did not show that he had knowledge of either the fraudulent scheme or the mailing. The evidence indicated that Simpson brought Langford into the company immediately after he bought Continental to help protect his interest in the Continental inventory. Ferrell, in turning over a list of credi-

## B. *Counts 49 and 50*

■ Counts 49 and 50 charged appellants Caldwell and Langford with violations of Section 1341 based on two purchase orders sent by a sales representative on behalf of Allied Imports to Microsonic Corporation in October and December 1976. Again the appellants contend that the evidence did not demonstrate that these mailings were for the purpose of executing a fraudulent scheme. They point out that Microsonic's credit manager testified that Allied Imports actually paid for the goods. They contend that no inference can therefore be reasonably drawn that the mailings were intended to further the Allied Imports bustout.

The government responds that, although no direct evidence showed the Microsonic orders to be anything other than a legitimate business transaction, the jury could nevertheless have inferred that Caldwell and Langford intended the orders to further the scheme. The government contends that there was ample evidence from which the jury could conclude Caldwell and Langford ran Allied Imports as a bustout. It urges that the jury could reasonably have inferred in turn that the Microsonic transactions were for the purpose of either developing a legitimate credit reference on which to build a strong credit rating or escalating Allied's credit limit with Microsonics so that it could make larger credit purchases in the future for which it would not pay. The government's position is unpersuasive for a number of reasons. First, the government produced no evidence to show that Allied ever used Microsonics as a credit reference, and the Microsonics credit manager testified that she never received credit inquiries from other companies regarding Allied. Other evidence tended to show that when bustouts developed a legitimate credit reference they relied on it re-

peatedly. Second, Allied never placed further orders with Microsonics; hence it did not use the transactions to escalate its credit. The government contends that *intent* to use the mailings in furtherance of the scheme is the key element, not their actual use. It argues that the jurors could have concluded that, although Caldwell and Langford intended to use their credit rating with Microsonics to escalate Allied's credit limit, they never got the opportunity because Allied closed down immediately after the Microsonics transactions. In fact, the evidence tended to show that Allied continued operations into the summer of 1977, six months after the Microsonics purchases—a significant amount of time in the life span of a normal bustout. Finally, the government produced no evidence that Allied did not sell the goods it purchased from Microsonics at a profit. Consequently, the Microsonics purchase orders could have been part of a legitimate transaction totally unrelated to the Allied bustout.

■ We refuse to expand Section 1341 to criminalize any use of the mails by parties to a fraudulent scheme. "[T]he proof must show that the use of the United States mail played an 'integral' rather than incidental or tangential role in the fraudulent scheme." *United States v. Bosby*, 675 F.2d 1174, 1183 (11th Cir.1982). In this case, the failure of the appellants during the six-month remaining life of the scheme actually to use the mailings to further its aims necessarily raises a reasonable doubt as to their intent to do so. Here there is no evidence, other than the existence of the scheme, even connecting the mailings to the scheme much less demonstrating that they played an "integral" role. Consequently, we hold that there was insufficient evidence supporting the jury's verdicts on Counts 49 and 50, and we reverse appel-

tors to Langford, informed him that they would be calling and that Ferrell had used an alias in dealing with them. Langford later handled some of the creditors himself. The jury could have inferred from this evidence that Langford was party to the Travel Inn/Continental/Rekcus scheme and that he was aware of or participated in attempts to pacify or put off the Rekcus creditors. Moreover, "[i]t is well-settled in this circuit that so long as one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails." *Toney*, 598 F.2d at 1355.

lants Caldwell's and Langford's convictions on those counts.

## C. *Appellant Hewes*

Appellant Hewes, asserting that he is "different from the rest," attacks the sufficiency of the evidence for all of his convictions. He contends (1) that the evidence failed to show any connection between him and the mailing that served as the basis of his conviction for mail fraud under Count 18 and the telephone conversations that served as the basis for his wire fraud convictions, 18 U.S.C.A. § 1343,[25] under Counts 22–25; (2) that because the evidence is insufficient to sustain his conviction of these "predicate" offenses, his conviction under Count 2, the substantive RICO count, must be reversed; and (3) that there was no evidence connecting him to the RICO conspiracy and his conviction under Count 1 must be reversed. A review of the record convinces us that there is no merit to these claims.

Hewes claims that the evidence showed no "connection" between him and the communications that are the basis for his mail and wire fraud convictions. More precisely stated, Hewes argues that the government has failed to prove that he "caused" the communications, as Sections 1341 and 1343 require. He contends that he could not have caused the phone conversations alleged in Counts 22 through 24 because he sold Dart Distributing on October 5, 1976, prior to the time these conversations took place. These conversations were credit inquiries made to Reachout International, a bustout operated by Eugene Smith, a former employee of Hewes at Dart. Hewes contends that, although the Count 25 phone conversation, another credit inquiry to Reachout, and the Count 18 mailing, a purchase order, did occur while Hewes owned

the company, there was no direct evidence connecting him to either communication.

There was substantial evidence that Hewes ran Dart Distributing as a bustout. Testimony of several witnesses showed that Hewes had been associated with at least two similar operations, Art Sales/Bonanza and Ferhoff Distributing, in the past and that appellant Haley had taught him how to run such an operation. When Hewes formed Dart in the autumn of 1975, he approached Craig Cloninger, an accountant, and requested that he prepare a falsified financial statement for the corporation. Cloninger testified that Hewes told him that Dart would be run as a bustout. Hewes also told Eugene Smith that Dart would be a bustout when he hired Smith to be Dart's sales manager in January 1976. Evidence tended to show that Hewes operated Dart as a bustout in that he purchased large amounts of inventory on credit, sold it at cut-rate prices, and never paid his suppliers. Dart went into involuntary bankruptcy in March 1977 with over one million dollars of unsecured claims outstanding. Its creditors eventually received 1.5 cents on the dollar.

Hewes's ostensible separation from Dart in early October 1976 does not require us to reverse his convictions on Counts 22, 23, and 24. First, the jury could have inferred that the sale of Dart was part of Hewes's fraudulent bustout scheme. The evidence demonstrated that a typical pattern was for the owner and operator of a bustout to sell the company to a "take-down man" who would bankrupt it for him and insulate him from his creditors. Hewes had served as a take-down man for Art Sales/Bonanza. Moreover, the evidence showed that Hewes continued to have contacts with Dart after his "separation" from the company and that he even dealt with one of Dart's creditors on behalf

---

**25.** 18 U.S.C.A. § 1343 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television

communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

of the company after the sale. From this the jury was permitted to conclude that Hewes's disassociation from the fraudulent scheme was only apparent, and that he continued to be connected with it long after October 1976. Finally, even if Hewes had disassociated himself from the scheme, he would nevertheless be guilty of a violation of Section 1343. The evidence showed that Hewes arranged to receive the false credit references as early as the spring of 1976. Consequently, the telephone inquiries were the foreseeable consequence of the fraudulent Dart scheme. Moreover, they were clearly "for the purpose of executing such scheme." 18 U.S.C.A. § 1343. It is sufficient for the purposes of Section 1343 that the wire transmission be the foreseeable result of the fraudulent scheme. *United States v. Snyder*, 505 F.2d 595, 601 (5th Cir.1974), *cert. denied*, 420 U.S. 993, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975). The mere fact that Hewes's role in the scheme may have ended prior to the time the transmissions occurred does not shield him from criminal liability.

The communications made during Hewes's tenure at Dart are even more clearly attributable to him. At that time he was Dart's chief officer and was running the company as a bustout. Any telephone communications or mailings made in furtherance of the scheme were clearly foreseeable and therefore may serve as the basis for criminal liability. *Martino*, 648 F.2d at 394; *Snyder*, 505 F.2d at 601. Consequently, we affirm Hewes's convictions under Counts 18, 22, 23, 24, and 25.[26] Because the evidence supports his conviction of these predicate crimes, Hewes's attack on his substantive RICO conviction under Count 2 is without merit.

Hewes's contention that the government failed to produce sufficient evidence that he was a member of the overall RICO conspiracy is also without merit. Hewes contends that he had few contacts with the other defendants. The record shows otherwise. Hewes was involved in the Art Sales/Bonanza scheme along with Haley, Delosky, and Caldwell. For a short time he was an employee of Ferhoff, a bustout operated by Delosky, Ferrell, and Simpson. Hewes's bustout, Dart Distributing, exchanged credit references with Allied Imports, Reachout, Continental Distributing, and Creative Sales. Given these connections, it was clearly reasonable for the jury to conclude that Hewes conspired with the other conspirators to operate bustouts and to exchange false credit references in order to advance the illegal ends of the RICO enterprise.

## VIII. THE LEGALITY OF THE SENTENCES

■■■ On the wire and mail fraud counts the district court imposed prison sentences of one year plus fines of one thousand dollars, the prison sentences to be suspended upon payment of the fines. The appellants contend that these sentences violate the equal protection component of the Fifth Amendment Due Process Clause in that they discriminate against defendants who cannot afford to pay the fine. *See Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970); *Burton v. Goodlett*, 480 F.2d 983 (5th Cir.1973).

The Federal Bureau of Prisons has recognized the unconstitutionality of such "committed fines," those for which failure to pay results in a prison term or extension of a defendant's imprisonment, when applied to an indigent and has stated that no indigent will be incarcerated for failure to pay such a fine. Bureau of Prisons Policy Statement 2101.2A (June 25, 1971). In order to enforce this policy, the Bureau has established an administrative procedure to determine whether defendants who receive such alternative sentences are indigent and therefore entitled to relief. 28 C.F.R. § 2.7

---

**26.** We also reject Hewes's contention that because Eugene Smith did not testify to the exact purpose of the letter that formed the basis of Count 18, the mailing was not "for the purpose of executing" the fraudulent scheme. That letter was a purchase order sent to Amico. Smith testified that Dart had given false information to Amico in the past, and Amico never received full payment for the items it sold to Dart on credit. The jury was entitled to conclude that this mailing was in furtherance of the bustout scheme.

(1983). Three Courts of Appeals when faced with challenges to committed fines have refused to rule on their constitutionality prior to the expiration of the prisoner's non-contingent prison terms until the prisoner exhausts the administrative remedy provided by the Bureau of Prisons. *United States v. Mack,* 655 F.2d 843, 846–47 (8th Cir.1981); *United States v. Estrada de Castillo,* 549 F.2d 583, 585 (9th Cir.1976); *United States v. Glazer,* 532 F.2d 224, 230–31 (2d Cir.), *cert. denied,* 429 U.S. 844, 97 S.Ct. 123, 50 L.Ed.2d 115 (1976); *cf. United States v. Grose,* 687 F.2d 1298, 1300–01 (10th Cir.1982) (en banc) (holding the constitutional question not premature but not discussing the administrative remedy). We agree with the wisdom of this rule and adopt it for this Circuit. A prisoner who has not yet begun to serve his contingent sentence and who has not exhausted his administrative remedies seeks relief from a merely hypothetical injury. We express no opinion on the ability of appellants to raise such constitutional claims immediately on direct appeal where their entire prison sentence is contingent on the payment of a fine. Because all appellants received substantial non-contingent prison sentences, and because none has exhausted his administrative remedy, we refuse to overturn the "committed fines" sentences.

## IX. OTHER ISSUES

 A bankruptcy judge testified regarding the proceedings in the Travel Inn/Continental/Rekcus bankruptcy. In response to a defense question the judge volunteered that there had been an allegation of fraudulent concealment of certain assets. Later, in response to a prosecutor's question on re-direct, the judge stated that it was his job to "ascertain fraud in a bankruptcy," and that he "apparently ... did not complete that job in this case." The trial court immediately ruled that this evidence be stricken and instructed the jury to "disregard it entirely." The court later gave another cautionary instruction. The appellants argue that this testimony entitled them to a mistrial. After reviewing the record, we conclude that the testimony was sufficiently benign, and the court's cautionary instructions sufficiently curative, that the appellants were not significantly prejudiced.

 The appellants also contend that the trial court's permission to the prosecutors to use leading questions during direct examination prejudiced the trial. Our review of the record indicates that the trial court's occasional tolerance of leading questions in the direct examination of both prosecution and defense witnesses was well within the discretion afforded by Fed. R.Evid. 611(c). *See United States v. Johnson,* 495 F.2d 1097, 1101 (5th Cir.1974).

Finally, the appellants urge that the "cumulative effect" of various non-reversible errors warrants reversal of their convictions. *See e.g. United States v. Williams,* 523 F.2d 1203, 1209 (5th Cir.1975). The record indicates that the court conducted the trial fairly and decorously and that the appellants' argument is without merit.

For the above reasons we AFFIRM as to each conviction of each appellant except for Caldwell's and Langford's convictions on Counts 49 and 50. The convictions of Caldwell and Langford on Counts 49 and 50 are REVERSED.

AFFIRMED IN PART and REVERSED IN PART.