**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Delores EIRIN, a/k/a "Lolita", Roberto Botero, Defendants-Appellants.**

No. 84–5772.

United States Court of Appeals, Eleventh Circuit.

Dec. 19, 1985.

---

**3.** Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

J. David Bogenschutz, Kay & Bogen-schutz, P.A., Fort Lauderdale, Fla., Rhea P. Grossman, Miami, Fla., for Eirin.

Joel Hirschhorn, Miami, Fla., for Botero.

Stanley Marcus, U.S. Atty., Gerald Houli-han, Kathleen Williams, Linda Collins-Hertz, Asst. U.S. Attys., Miami, Fla., for the U.S.

Before HATCHETT and CLARK, Circuit Judges, and ALLGOOD *, District Judge.

HATCHETT, Circuit Judge:

In this "money laundering" case in which more than $57,000,000 passed through one bank in a ten month period, all without proper reports being filed, we are urged to reverse the appellants' convictions for numerous alleged errors relating to pre-trial investigative techniques, admission of evidence, trial judge misconduct, failure to sever appellants, and prosecutorial misconduct. We affirm.

### FACTS

In October, 1979, Hernan Botero entered the Landmark First National Bank of Fort Lauderdale, West Broward Branch, and asked Delores Eirin, a bank officer, whether large amounts of cash could be deposited without filing government reports.

---

* Honorable Clarence W. Allgood, U.S. District Judge from the Northern District of Alabama, sitting by designation.

Federal law requires banks to file Currency Transaction Reports (CTR) with the Internal Revenue Service (IRS) on all cash transactions of $10,000 or more.

Following Botero's inquiry, Eirin discussed a money laundering scheme with two bank loan officers, Alan Campbell and Gary Dodson. In December, 1979, Eirin introduced Botero to Campbell and Dodson. Botero explained that he imported a Colombian "product" into the United States and sold it for cash. Botero intended to convert the U.S. currency into pesos and then transfer the money to Colombian banks without notifying the government. Botero insisted that the transfers to Colombia be made quickly to avoid loss because of fluctuating currency rates. Botero illustrated his operation by drawing a circular diagram on a legal pad to demonstrate the movement of his "product" into the United States and the corresponding flow of funds to Colombia.

While describing his business, Botero never identified the "product"; he told Campbell and Dodson to expect about $400,000 each banking day. Botero agreed to pay the three bankers ¾ of 1 percent of the gross receipts for handling the deposits without filing CTRs.

In December, 1979, Botero opened five accounts using fictitious names that Eirin provided.[1] While sitting at Eirin's desk, Botero made a telephone call to an unknown individual who assigned five passport numbers to be used as identification on the signature cards. Eirin subsequently sent Arthur Griffin, the West Broward manager of the Landmark Bank, a memo stating that she opened all five accounts.

Because of the use of El Salvador passport numbers, the bankers decided that the cover story for the deposits would be that the five individuals were citizens of San Salvador who were attempting to get their money out of the country due to increasing political unrest.[2]

Botero introduced the bankers to two couriers who would deliver money to the bank. Lasardo Restrepo was one of Botero's couriers who made the initial $400,000 deposit on December 31, 1979. Botero returned to the bank and determined that the transaction was properly processed. He subsequently paid Eirin, Campbell, and Dodson their first $3,000 commission by drawing a check on his personal and/or business account, C.I.A. Rodnan S.A.

Eirin, Campbell, and Dodson decided to pay two bank employees who counted cash, Norma Cocuzza, the head teller, and Jeanette Winus, the head of the collection department. Eirin, Campbell, and Dodson believed that the payments would ensure that these employees would not complain about the additional work involved in counting such large amounts of cash. Subsequently, Eirin, Campbell, and Dodson paid Cocuzza and Winus 10 percent of the total commission they received from each deposit. Cocuzza and Winus received cash payments, usually in an envelope; often, they received payments from each of the three bankers. Eirin, Campbell, and Dodson never told Cocuzza and Winus of the laundering scheme and their failure to file CRTs; rather, the bankers justified the payments as compensation for the late working hours.

When Winus questioned Eirin about the source of the money, Eirin told her the "cover story" that five wealthy Salvadorans were transferring their money out of the country because of political unrest. Further, Eirin assured Winus that the CTRs were being filed for the cash depos-

---

1. The fictitious accounts are as follows:
Account A: 44–343–519–4  Carlos Alirio Rivillas Rojas
Account B: 44–343–520–5  Conrado Tamayo Roldan
Account C: 44–343–521–6  Pablo Emilio Barrientos Garcia
Account D: 44–343–522–7  Eriberto Quiroz Sanchez

Account E: 44–343–523–8  Enrique Salazar Jaramillo.

2. The deputy minister of foreign affairs of El Salvador searched the archives of that office and determined that there was no record of the names on the passports or any corresponding Salvadoran passport numbers issued.

its. Also, Eirin told Fran Volz, another bank employee, that the CTRs were properly filed. Again, in February, 1980, Eirin sent a memo to Griffin stating that she had opened the five accounts and that the customers were "very nice with proper I.D. from San Salvador," and that she was filing CTRs on the deposits.

In January and February, 1980, a majority of the cash was transferred by wire to the Pan American Bank in Miami for credit to accounts in two Colombian banks, Banco de Bogota, Colpatria, and Banco de los Trabajadores. Additionally, Eirin, Campbell, and Dodson also wired funds to at least sixteen other banks or individuals.

Because the wire transfers attracted the attention of Landmark's main office, Eirin, Campbell, and Dodson began transferring money with cashier's checks; all three bankers had authority to sign these checks, and this method was subject to less scrutiny by bank management.

The initial deposit set a pattern for all deposits to follow. Couriers brought cash deposits into the bank in suitcases, duffel bags, cardboard boxes, T.V. boxes, and paper bags. Then, Eirin, Campbell, and Dodson received a commission from which they paid the bank tellers.

Eirin maintained a "bible" of the operation, a stenographic pad, which included a detailed record of deposits and distribution of the proceeds. Dodson destroyed the pad prior to his departure from the bank.

Eirin, Campbell, and Dodson prepared CTRs for each deposit. They destroyed the original copy of each report, which should have been sent to the Internal Revenue Service; they placed a copy of each report in the bank's files, so that management would believe that the forms were properly filed.

In February or March, 1980, Hernan Botero introduced his brother, Roberto Botero, to Eirin, Campbell, and Dodson. Subsequently, Roberto Botero began to monitor and direct the cash transfers. Roberto Botero encouraged the bankers to move the cash quickly; he told Dodson that the people at the Pan American Bank in Miami worked faster and "weren't getting paid." Roberto Botero also stressed to Campbell and Dodson that the CTRs should not be filed.

Eirin told Campbell and Dodson that she was investing her commissions in Venezuelan cattle. She also indicated that she was making deposits into an account for Roberto G. Gabari, her nephew. On March 14, 1978, Eirin opened a savings account at Landmark Bank for Gabari. From March, 1978 to March, 1980, the account was virtually inactive with a maximum balance of less than $400. Between March 25 through October 15, 1980, Eirin made 23 cash deposits into the account totaling $92,-964. By December 31, 1980, the account contained about $71,000. In January, 1981, Eirin withdrew $60,000: $10,000 cash and $50,000 in cashier's checks payable to Gabari.

In May, 1980, Restrepo entered the bank several times without any money. He told the bankers that one of Hernan Botero's boats had been seized during the Mariel boat lift, which interfered with business. Shortly thereafter, the couriers continued to deposit cash regularly.

In October, 1980, Federal Bank Examiners and Treasury Special Agents arrived at the bank. Following their arrival, the Boteros did not deposit any money into the Landmark Bank. Eirin told Campbell and Dodson that if the examiners questioned her about the "laundering operation" she would just play dumb.

Between December, 1979 and October, 1980, the Boteros deposited over $57 million into the 5 fictitious accounts. During this time, the Boteros placed funds directly from the five accounts into their own personal and business accounts.

On February 10, 1981, law enforcement officers arrested Eirin and Botero. Campbell and Dodson entered into an agreement with the government. In exchange for their cooperation and truthful testimony regarding illegal activities at Landmark Bank, the government agreed to accept

from each a guilty plea to a misdemeanor charge of receiving gratuities.

On February 19, 1981, the grand jury returned an eighteen-count indictment charging Eirin, Roberto Botero, and others with violations of federal currency laws regarding disclosure of cash deposits. On March 25, 1981, a superseding indictment charged additional defendants.[3] Following the government's dismissal of six counts of mail fraud, the government prosecuted Eirin and Botero on the remaining twelve charges. Count I charges that the appellants intentionally conspired to defraud the United States by obstructing the collection of financial data and failing to file CTRs in violation of 18 U.S.C.A. § 371. Count II charges appellants with intentionally falsifying and concealing material facts within the jurisdiction of the IRS in violation of 18 U.S.C.A. §§ 1001 and 1002. Counts III through XII charge appellants with deliberately failing to file CTRs in violation of 31 U.S.C.A. §§ 1059, 1081, and 18 U.S.C.A. § 2. On July 25, 1985, the jury returned verdicts finding Eirin guilty on all counts and Botero guilty on all counts except Count IV.

## ISSUES

Appellants raise six issues: (1) Whether the district court erred in admitting Botero's post-arrest statements; (2) whether the district court erred in admitting coconspirator statements under Federal Rule of Evidence 801(d)(2)(e); (3) whether the district court erred in admitting evidence of other money laundering schemes under Federal Rule of Evidence 404(b); (4) whether the district court erred in denying appellants' motions for severance; (5) whether the district court made an improper comment sufficient to require a new trial; and (6) whether the appellants are entitled to a new trial for alleged prosecutorial misconduct.

**3.** Other individuals charged in the indictment included: Hernan Botero, Losardo Restrepo, John Doe, Richard Rowe, Peter Poe, Alberto Cano, Gerado Marrero, Jaime Bustamante, and Alberto Meri. At the time of trial, only Eirin and Roberto Botero had been arrested; other

## DISCUSSION

In the first issue, Botero contends that the district court erred in admitting his post-arrest statements in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He argues that IRS Agent Michael Mullaney continued to interrogate him after he requested an attorney. Botero claims that when he elected to defer questions about his brother without an attorney, he effectively invoked his right to counsel. Yet, Mullaney continued to ask questions. Botero argues that Mullaney's testimony recounting Botero's post-conviction statements furthered the government's theory of a conspiracy between him and his brother, Hernan Botero.

Mullaney testified that Botero denied knowing the five individuals whose names appeared on the Landmark Bank accounts and that he never engaged in any transactions with those accounts. Mullaney testified that Botero admitted he handled Hernan Botero's C.I.A. Rodnan account for Hernan's profitable shipping business. Mullaney further stated that Botero admitted that he "might have" talked with Campbell and Dodson at the Landmark Bank. Botero concludes that Mullaney's testimony detailing these post-arrest statements was highly prejudicial.

In *Miranda*, the Court held:

Prior to any questioning, the person [in custody] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes

indicted defendants were fugitives. In January, 1985, the Colombian government extradited Hernan Botero to the United States to stand trial on seven counts of the indictment. On June 25, 1985, a jury convicted Hernan Botero of all seven counts.

to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

*Miranda*, 384 U.S. at 444–45, 86 S.Ct. at 1612. In *Edwards v. Arizona*, the Court expanded on the *Miranda* rule and held that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378

(1981) (footnote omitted).

On July 13, 1981, Botero filed a motion to suppress his post-arrest statements. The district court denied the motion just prior to trial in July, 1984. The district court found that Botero invoked his right to counsel, but that *Solem v. Stumes* suggested that *Edwards* could not be applied retroactively. *Solem*, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984). Nevertheless, the district court denied the motion to suppress because Botero knowingly, voluntarily, and intelligently waived his right to the presence of counsel.

Botero argues that in *Shea v. Louisiana*, the Court clarified *Stumes* and held that the rule announced in *Edwards* applied retroactively to cases pending on direct appeal when *Edwards* was announced. 470 U.S. ——, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985). Because *Edwards* was decided while Botero's motion to suppress was pending in the district court, Botero argues that the district court erroneously relied on

*Stumes* to admit his post-arrest statements.

In *Shea*, the Court stated that *Edwards* does not retroactively apply to pending federal habeas corpus appeals challenging final state convictions. *Shea*, 470 U.S. ——, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985). The Court distinguished *Solem* and held that *Edwards* retroactively applies to direct appeals pending when *Edwards* was decided. 470 U.S. at ——, n. 4, 105 S.Ct. at 1070 n. 4, 84 L.Ed.2d at 46 n. 4. Hence, the district court erred in determining that *Edwards* does not apply retroactively to the instant case.[4]

Although we find the district court's reasoning erroneous, we agree that the motion to suppress was properly denied. Botero's reliance on *Edwards* and its progeny ignores the basic underlying determination of whether he clearly invoked his right to counsel. We find that Botero did not affirmatively request an attorney.

In *Edwards*, the suspect clearly articulated his request for an attorney. Edwards said, "I want an attorney before making a deal." 451 U.S. at 478, 101 S.Ct. at 1881. Immediately thereafter, the interrogating officer discontinued his questioning. "The accused, however, must actually articulate his request for an attorney." *United States v. Pearson*, 746 F.2d 787, 793 (11th Cir.1984).

When federal agents arrested Botero, they advised him of his *Miranda* rights in English and in Spanish. Again, IRS Agents J'Ernigan and Mullaney informed Botero of his rights; Botero acknowledged that he understood them. The agents gave Botero a "waiver of rights" form to read and sign. Botero refused to sign the waiver "until an attorney told him to sign it."

Thereafter, Botero exhibited a willingness to cooperate with the agents; he consented to a search of his car and responded fully and freely to all questions regarding his own business and interests.

**4.** *Shea v. Louisiana* was not decided when the district court ruled on Botero's motions.

Q. Why did you continue to answer the questions even after you had asked for permission to call your wife so she could contact an attorney for you, did you still continue answering questions?

\* \* \* \* \* \*

A. Because I felt so at ease, my conscience was such at ease, my charges that I saw were so outrageous or fantastic that I just felt very clear, and my mind became very lightened as a matter of fact.

The only subject Botero refused to discuss concerned his brother, Hernan Botero.

Q. Okay. You had said to them I would rather not talk about my brother without an attorney being present. They they continued persistently to ask you questions about Hernan. Why did you continue to answer?

A. It wasn't about Hernan, it was about me. Hernan's name came into the picture because it related to me somewhat in the sense that I had to refer to him, or they had to refer to him, whatever, depending on the question.

Q. What I'm driving at is this, if you had already told them you didn't want to talk about Hernan because you didn't want to get him in trouble, so to speak, or say something that could be held against him, why did you even answer the questions?

A. Well, because it related to me. The question was about me.

■ Merely refusing to sign a waiver of rights form without an attorney's guidance is not synonymous with an affirmative request for assistance of counsel. Further, Botero's subsequent confidence and willingness to discuss selective topics demonstrated a deliberate effort to protect particular information. Botero voluntarily exercised his option to respond to the government agents' questions. The agents respected his request to limit the scope of the inquiry and refrained from pursuing questions solely about his brother's activities. [The suspect] stated without the slightest ambiguity that he would then and there answer some questions but not others. The word 'attorney' has no talismanic qualities. A defendant does not invoke his right to counsel anytime the word falls from his lips.... [The suspect's] actions and statements did not invoke any present right to counsel. [Citations omitted.]

*United States v. Jardina,* 747 F.2d 945, 949 (5th Cir.1984). *See Thompson v. Wainwright,* 601 F.2d 768, 772 (5th Cir. 1979).

■ Botero's reference to an attorney concerned the execution of a legal document and did not relate to his immediate desire for an attorney before talking with government agents. Botero acknowledged that he understood his rights and proceeded to discuss with Agent Mullaney all matters relating to himself. Hence, the government agents did not elicit Botero's statements in violation of *Edwards.*

We find that the district court erred in determining that Botero invoked his right to counsel. Yet, we agree with the district court's ultimate decision to admit Botero's post-arrest statements. The record supports the district court's finding that Botero understood his right to counsel. The agents advised him of his *Miranda* rights in English and Spanish. Shortly after his arrest, he acknowledged his right to an attorney when he refused to sign a waiver of his *Miranda* rights. He then proceeded to answer questions excluding specific inquiries solely regarding his brother's activities. Botero attempted to refrain from implicating his brother in the money laundering scheme. His decision to selectively address some questions and not others evidences his understanding that he is not obligated to respond to any question, either with or without the presence of an attorney. Considering the circumstances surrounding the interrogatories, we find that Botero effectively waived his right to counsel. *Edwards,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883 (1981); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

### Coconspirator Allegations

■ In the second issue, Botero and Eirin contend that the court erred in admitting a coconspirator's statements under Federal Rule of Evidence 801(d)(2)(E). They argue that the government failed to present sufficient independent evidence of a conspiracy prior to admission of Restrepo's statements. *United States v. James,* 590 F.2d 575 (5th Cir.1979) (en banc). Further, Botero and Eirin insist that Restrepo's statements were not "in furtherance of" an alleged conspiracy.

The government argues that the evidence established Restrepo as the primary courier who delivered money to the bank for the five accounts. Botero and Eirin argue that the court erred in admitting Campbell's testimony recounting his discussion with Restrepo about the relationship between seizure of one of Hernan Botero's boats during the Mariel boatlift and the brief cessation of deposits in May, 1980.[5] Botero and Eirin argue that these statements allowed the jury to draw a prejudicial inference that the "product" was cocaine.

In *James,* we established the rule that prior to the admission of a coconspirator's statements against a defendant in a criminal case under Federal Rule of Evidence 801(d)(2)(E), the government must present "a sufficient showing, by independent evidence, of a conspiracy among one or more defendants and the declarant." *James,* 590 F.2d at 581 (quoting *United States v. Nixon,* 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974)). The government is required to establish the existence of a conspiracy in order to "protect the defendant from the admission of prejudicial hearsay on the basis of threadbare evidence of conspiracy." *United States v. Grassi,* 616 F.2d 1295, 1300 (5th Cir.1980).

The district court determines whether the admissibility standard has been satisfied. *James,* 590 F.2d at 581. "At issue is a factual determination, which includes both a quantitative and qualitative evaluation of the evidence." *United States v. Perry,* 624 F.2d 29, 30 (5th Cir.1980). The existence of an agreement may be proved by circumstantial evidence, such as "inferences from the conduct of the alleged participants or from circumstantial evidence of the scheme." *United States v. Tamargo,* 672 F.2d 887, 889 (11th Cir.1982) (quoting *United States v. Spradlen,* 662 F.2d 724, 727 (11th Cir.1981)). "Proof is not required that the defendant had knowledge of all the details of the conspiracy; the defendant need only have knowledge of the essential objective of the conspiracy." *Tamargo,* 672 F.2d at 889.

We find that the government established Botero and Eirin's participation in a conspiracy to "launder" money with sufficient independent evidence. The government introduced Eirin's February, 1980 letter to Griffin, Landmark Bank's branch manager. While testifying, Griffin read the memo.

> This is a memo to me from Lolita Eirin, subject, large deposits in cash—I opened five accounts which the deposits were made in cash over $10,000, and then it lists the names of the customers and account numbers. The cash came in mixed bills of high denominations. Customers were very nice with proper I.D. Also they are from San Salvador. They called periodically to transfer funds to various banks in Miami to credit business accounts. I have made the currency transaction report in almost all deposits but I am not sure if I have done all of them, because I'm not always here.

Cocuzza, a bank teller, testified that under Eirin's direction, she periodically count-

---

**5.** Campbell testified as follows:

Q. Would you tell the court and jury what was said at the time by Mr. Restrepo and by the participants in the conversation?
A. I asked Mr. Restrepo why we hadn't seen him in so long. He said the business had been very bad, and he said the reason was because the Mariel boatlift.

\* \* \* \* \* \*

A. He told me that one of Mr. Botero's boats had been seized as a result of all the extra boats out in the water at this time.
Q. Did you understand that to mean Hernan Botero's boats?
A. Yes, sir.

ed between $300,000–$400,000 and deposited the funds into five accounts. Cocuzza stated that Eirin, Campbell, and Dodson periodically gave her $300 cash payments in a payroll envelope. Eirin explained to Cocuzza that "the customer" wanted to compensate the employees who stayed late to count the money.

In the presence of Winus, a supervisor in the collection department, Cocuzza asked Eirin, Campbell, and Dodson "if the CTRs were being made out, and they said yes, that everything was being taken care of and the bank was very happy with the deposits that we were taking in." Cocuzza regularly received deposit tickets for the same five accounts from Eirin, Campbell, and Dodson. Winus also counted money with Cocuzza; her testimony is consistent with Cocuzza's explanation of events.

Additionally, the government presented evidence of Roberto Botero's participation; checks drawn from the same five fictitious accounts were deposited into both his personal account at the Landmark Bank and a business account at Bankers Trust. Botero opened his IPN account at Bankers Trust with documents indicating he was director of the company and a signatory on the account.

The government also relied on Campbell and Dodson's extensive testimony detailing the operation to establish Botero and Eirin's respective roles in the conspiracy. Their testimony confirms the government's other independent evidence of the conspiracy.

We find that the district court properly found sufficient independent evidence of a conspiracy between Roberto Botero and Eirin to admit the coconspirator's statements. *James*, 590 F.2d 575 (5th Cir.1979).

### Similar Act Evidence

In the third issue, Botero and Eirin contend that the district court erred in admitting evidence of Eirin's participation in two other money laundering schemes at the Landmark Bank. The district court admitted the evidence under Federal Rule of Evidence 404(b). Both Campbell and Dodson testified that, along with Eirin, they engaged in two other similar operations between December 19, 1979, and October, 1980.

Campbell and Dodson testified that after Restrepo's initial deposit for Botero, Restrepo began making deposits into his personal account. Botero did not know about Restrepo's scheme; Campbell testified that Restrepo "distinctly told us not to tell [Botero]." Campbell testified that Restrepo's operation paralleled Botero's plan:

Q. Did Mr. Restrepo tell you not to say anything to Botero—

      *     *     *     *     *     *

A. Yes, sir. He distinctly told us not to tell him.

Q. Now, with regard to the deposits that were made by Restrepo, was the— was it done in the same manner as the deposits that were made with regard to the five accounts which had been the subject matter of this testimony?

A. Yes, sir.

Q. Except that the fee was 1 percent?

A. Correct.

Q. And the two tellers that were counting it got a portion of that; is that correct?

A. Yes, sir.

Q. And the remaining amount was split between you and Ms. Eirin and Mr. Dodson; is that correct?

A. Correct.

Similarly, Campbell, Dodson, and Eirin participated in a third money laundering scheme between December, 1979, and May, 1980, with Carlos Urdinata, who opened between three and five fictitious accounts. Dodson testified:

Q. Were there any other deposits made in connection with any other money laundering scheme other than the Restrepo?

A. Yes. There was one other party involved that had brought money in.

Q. And how did that arise?

A. I can't remember who had the first conversation with the gentleman. His name is Urdinata ... Carlos Urdinata. But he was—he began bringing money in

on a much smaller scale and then it stopped at the time that the Mariel boatlift began and never resumed again.

Q. Did you ever have any conversation with Ms. Eirin concerning Urdinata's account? Or accounts?

A. Yes. It was done in the same manner. It was handled in the same manner that the other two methods of laundering the money were done.

The government proffered evidence of the two other money laundering schemes under Federal Rule of Evidence 404(b).[6] Botero and Eirin contend that the evidence is highly prejudicial, outweighs its probative value, and should be excluded under Federal Rule of Evidence 403.[7]

We review the decision to admit the extrinsic act evidence under Federal Rule of Evidence 404(b), under a "clear abuse of discretion" standard. *United States v. Hewes*, 729 F.2d 1302, 1314 (11th Cir.1984).

Rule 404(b) prohibits admission of evidence of similar acts to prove bad character, but provides that such evidence is admissible for other purposes. In *United States v. Beechum*, the Fifth Circuit laid out the principles which guide a decision whether to admit evidence of extrinsic acts. 582 F.2d 898 (5th Cir.1978). *Beechum* established a two-part test:

> First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403.

*Beechum*, 582 F.2d at 911. "[T]he law in this circuit is that, in the context of a *conspiracy* case, the mere entry of a not guilty plea sufficiently raises the issue of intent to justify the admissibility of extrinsic offense evidence." *United States v. Kopituk*, 690 F.2d 1289, 1334 (11th Cir. 1982) (emphasis in original). "The relevancy of extrinsic offense evidence of intent is determined by comparing the state of mind of the defendant in perpetrating both—the extrinsic and contemporaneous—offenses." *United States v. Russo*, 717 F.2d 545, 551 (11th Cir.1983). Additionally, in *United States v. Hewes*, the court found extrinsic similar act evidence admissible "to depict the plan of operation and show the defendants' experience and ability to execute such schemes, and to show the 'genesis and formation of the conspiracy.'" *Hewes*, 729 F.2d at 1315.

■ The relevancy of extrinsic offense evidence is measured by the similarity of the extrinsic offense to the offense charged. *Kopituk*, 690 F.2d at 1334. We have generally held that if the extrinsic acts are similar to the charged offense, and are proximate in time to the charged offenses, the extrinsic evidence is relevant and highly probative on the issue of intent. *Hewes*, 729 F.2d at 1314.

■ The similarity and, hence, relevancy of Eirin's extrinsic offenses to the offenses charged below was undeniable. The evidence establishes that Eirin, Campbell, and Dodson participated in identical money laundering operations while engaging in the offense charged in the instant case. Eirin, Campbell, and Dodson opened fictitious accounts into which a courier deposited large amounts of cash. Eirin, Campbell, and Dodson received commissions based upon the deposits; they paid bank employees to count the money and then transferred the money to other accounts. Eirin,

---

**6.** Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**7.** Federal Rule of Evidence 403 provides:

Exclusion of relevant evidence on grounds of prejudice, confusion, waste of time.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Campbell, and Dodson never filed the required CTRs.

The state of mind inherent in the commission of such nearly identical offenses would necessarily be the same. The extrinsic offense evidence meets the allowable criteria for admission under Federal Rule of Evidence 404(b) and is relevant to prove motive, opportunity, plan, knowledge, and absence of mistake or accident. The first portion of the *Beechum* test is clearly satisfied.

The next question is whether under rule 403, the probative value of the extrinsic offense evidence is substantially outweighed by its potential unfair prejudicial effect. "This determination lies within the sound discretion of the trial court and calls for a 'common sense assessment of all the circumstances surrounding the extrinsic offense,' including prosecutorial need, the overall similarity between the extrinsic act and the charged offense, and the temporal proximity of the two." *United States v. Wyatt*, 762 F.2d 908, 911 (11th Cir.1985) (quoting *United States v. Dothard*, 666 F.2d 498, 502–03 (11th Cir.1982)).

Although there was some potential for prejudice because of the similarity of the extrinsic and charged offenses, the extrinsic acts were not likely to incite the jury to an irrational decision. *United States v. Hewes*, 729 F.2d 1302, 1315 (11th Cir.1984). Such irrationality is the primary target of rule 403. Evidence of Eirin's active participation in parallel money laundering schemes at Landmark Bank during the same time period renders the possibility of prejudice minimal. Moreover, the district court's cautionary instruction, which it repeated several times during the presentation of evidence and included in the jury instruction, mitigated any prejudice against Botero or Eirin.[8]

We must balance this slight possibility of prejudice against the probative value of the extrinsic act evidence. We find that the trial court did not abuse its discretion in admitting the evidence of extrinsic offenses.

### Severance

■ In the fourth issue, Botero and Eirin argue that the district court erred in denying their motions for severance. Eirin argues generally that she was prejudiced; Botero argues that he was prejudiced by the "spillover" effect of the extrinsic act evidence of Eirin's involvement admitted solely against Eirin.

The district court is accorded broad discretion in deciding whether to grant a motion for severance and will be reversed only for abuse of discretion. *Hewes*, 729 F.2d at 1318; *United States v. McCulley*, 673 F.2d 346, 349 (11th Cir.1982). Appellants must show that they "received an unfair trial and suffered compelling prejudice against

---

**8.** The district court repeatedly instructed the jury:

> [T]he sole purpose for which this evidence is being offered is under what we call similar act evidence. And if it is to be considered at all it must be considered insofar as the law allows it to be.
>
> Evidence that an act was done at one time or on one occasion is not any evidence or proof whatever that a similar act was done at another time or on another occasion. That is to say, evidence that a defendant may have committed an act similar to the acts alleged in the indictment may not be considered by the jury in determining whether the accused in fact committed any act charged in the indictment. Nor may evidence of some other act of a like nature be considered for any other purpose whatever unless the jury first finds that the other evidence in the case, standing alone, establishes beyond a reasonable doubt

that the accused did the particular act charged in the particular count of the indictment then under consideration. If the jury should find beyond a reasonable doubt from other evidence in the case that the accused did the act charged in the particular count of the indictment under consideration, then the jury may consider—not required to, but may consider evidence as to an alleged act of a like nature in determining the state of mind or intent with which the accused did the act charged in the particular count. And where proof of an alleged act of a like nature is established by evidence which is clear and conclusive, the jury may, but is not obligated to draw the inference and find that in doing the act charged in the particular count under deliberation, the accused acted willfully and not because of mistake or accident or other innocent reason.

which the trial court was unable to afford protection." *United States v. Russell,* 703 F.2d 1243, 1247 (11th Cir.1983) (quoting *United States v. Berkowitz,* 662 F.2d 1127, 1132 (5th Cir. Unit B 1981)).

Interests of judicial economy counsel that coconspirators be tried jointly. An appellant must demonstrate that he suffered "compelling prejudice" from the trial court's denial of his motion to sever. *United States v. Benz,* 740 F.2d 903, 913 (11th Cir.1984). " 'Compelling prejudice' means that the jury will not be able to 'collate and appraise the independent evidence against each defendant....' " *Benz,* 740 F.2d at 913 (quoting *Tillman v. United States,* 406 F.2d 930, 935 (5th Cir.1969). A district court may effectively dilute the prejudicial effect of admissible evidence against a codefendant with a clear cautionary instruction. In this case, the district court repeatedly instructed the jury to restrict its application of the extrinsic act evidence to Eirin only. The district court stated:

> I reiterate that you will consider the evidence ... only as to the defendant Eirin if at all and it is not in any form or fashion to be considered by you in determining the guilt or innocence of Roberto Botero.

Consistent with our decision on the proper admission of the extrinsic act evidence, we find the district court's instruction minimized the jury's misapplication of the evidence to Botero. Additionally, the verdict reflects that the jury considered and applied the cautionary instruction. "Convictions will invariably be sustained if it may be inferred from the verdict that the jury 'meticulously sifted the evidence,' as where it acquits on certain counts." *Hewes,* 729

F.2d at 1319 (quoting *United States v. Kabbaby,* 672 F.2d 857, 861 (11th Cir. 1982)). The jury returned a verdict of guilty against Eirin on all counts, but found Botero guilty on all counts except four. Some would conclude that the jury's ability to distinguish among the defendants in this manner suggests that it was able to determine the guilt of each individual based solely on his own acts, statements, and conduct. Although this conclusion does not necessarily follow, it can be given some weight.[9]

Eirin's arguments that she suffered compelling prejudice from denial of the motion to sever is without merit. Accordingly, we hold that the district court did not abuse its discretion in denying the appellants' motions for severance.

In the fifth issue, Botero and Eirin contend that the district court erred in denying their two motions for a mistrial. Botero and Eirin argue that the district court improperly commented during Dodson's testimony lending undue credibility to this government witness. Our review of the record reveals that the district court spent a considerable amount of time outside the presence of the jury with Dodson and the attorneys in a genuine attempt to clarify Dodson's testimony regarding letters authorizing wire transfers. Following the discussions, the district court read to the jury Dodson's responses to its questions conducted during the hearing held outside the jury's presence. In an instruction to the jury, the district court advised that it was not vouching for Dodson's credibility.[10]

---

**9.** The time has probably arrived when prosecutors and courts should refrain from concluding that because a defendant joined in an indictment or information with another defendant is not found guilty of all counts, severance was not required. Perhaps, the defendant would not have been convicted on any counts if in a separate trial. To what extent should a jury verdict control the courts in affording to each defendant a fair trial?

**10.** The court stated:

> Ladies and gentlemen, in addition to what I have indicated to you about clearing up this testimony I want it to be made clear that with regard to the determination of the credibility of this witness from the standpoint of testimony that he has given, that you are the sole determiners of that credibility.
>
> And from the standpoint of clearing this matter up in the fashion which we have, I do not mean to infer or attribute to you how you are to treat the balance of his testimony in any form or fashion. You must determine the extent to which credence and credibility is

In the instant case, we find that the district court made a good faith effort to clarify a witness's testimony.

> A trial judge is, however, more than a mere moderator and is under a duty to question witnesses and comment on evidence when it appears necessary. The trial court may interrogate a witness to clarify his testimony or to ensure that a case is fairly tried.

*United States v. Block*, 755 F.2d 770, 775 (11th Cir.1985) (citations omitted). The cautionary instruction minimized any prejudicial effect from the district court's comments. Hence, the district court properly denied the appellants' motion for a mistrial.

### Prosecutorial Misconduct

■ More often than before, we find allegations of prosecutorial misconduct. In this case, the most serious allegation is that the prosecutor sought to convey to the jury that the source of the funds deposited was drug sales. Drug sales were not charged. Although a juror could reasonably conclude that the funds came from unlawful activity without help, the prosecutor could not suggest the unlawful source. We do not reverse in this case because the few comments by the prosecutor were not sufficient, on the record as a whole, to unduly impress upon the jury matters not charged.

We warn prosecutors in this circuit that straying from what is charged to get to other matters more prejudicial will be condemned, convictions will be reversed, and where appropriate, disciplinary action will be recommended.

Accordingly, appellants' convictions are affirmed.

AFFIRMED.

---

to be given to his testimony and the amount of believability that is to be attributed.

And the fact that we have cleared up this matter doesn't mean that the court is attributing any truth or veracity to the balance, be-

cause it is not my job. You are the trier of the fact. I am not the trier of the facts, and I don't mean, in anything that I have said, to infer my opinion in that regard.