SPRINGFIELD HOUSING AUTHORITY *vs.* EDWIN BURGOS
& others.[1]

No. 91-P-150.

Hampden. February 18, 1992. - June 19, 1992.

Present: DREBEN, KASS, & GREENBERG, JJ

*Racketeer Influenced and Corrupt Organizations Act. Housing Court,* Jurisdiction. *Jurisdiction,* Housing Court, Federal field. *Words,* "Enterprise."

A judge of the Housing Court properly asserted jurisdiction pursuant to G. L. c. 185C, § 3, to consider a civil action brought by a housing authority under the Federal Racketeer Influenced and Corrupt Orgnizations Act (RICO), 18 U.S.C. § 1962(c) (1988), against alleged drug traffickers operating in a public housing development. [676-677]
Discussion of the elements to be proved to establish a claim of violation of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) (1988). [677-680]
In a civil action brought by a housing authority alleging violation of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) (1988), by certain persons engaged in drug trafficking in a housing project, the evidence did not warrant the conclusion that an "enterprise" existed within the meaning of RICO to distribute controlled substances, and the judge properly dismissed the complaint. [680-681]

CIVIL ACTION commenced in the Hampden County Division of the Housing Court Department on March 28, 1990.

The case was heard by *William H. Abrashkin,* J.

*Mary Z. Stuart,* for the plaintiff, submitted a brief.

GREENBERG, J. Beleaguered by relentless drug trafficking at the John L. Sullivan Apartments, the Springfield Housing Authority (Authority), owner and manager of the ninety-six

---

[1]Benjamin Burgos, Warren Brown, Rafael Morales Martinez, Charlie Hawkins, Enrique Cuilon, Luis Torres, Renee Palion, Eugene Britton, Julio Marin, and Luis Figueroa.

residential units at the complex, brought a complaint alleging that the defendants were engaged in activity which violated the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) (1988).[2] The Authority proceeded to trial in the Housing Court on so much of its complaint as alleged the RICO violations.[3] After the Authority completed the presentation of its evidence, six of the defendants (who appeared pro se) declined to testify. Five were not present and were defaulted. In his ruling, from which the Authority appeals, the judge, sua sponte, treated the RICO claim as if a motion had been filed under Mass.R.Civ.P. 41(b)(2), 365 Mass. 804 (1974); he made findings of fact pursuant to Mass.R.Civ.P. 52(a), 365 Mass. 816-817 (1974), and ordered a judgment dismissing the claim.

We rehearse (with supplement of uncontested material from the record) the pertinent facts found by the trial judge, which we leave undisturbed in the absence of clear error. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). See *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977). In February of 1990, police surveillance of the only access road to the development revealed that on frequent occasions an inordinate number of cars entered in the early morning. Young children on bicycles, characterized as "spot-

---

[2]The RICO act, Title IX of the Organized Crime Control Act of 1970, was enacted as a comprehensive criminal and civil remedy to be used against organized criminal activity. Since its enactment, it has been utilized in settings that were unanticipated by the Congress. See Note, RICO: Limiting Suits by Altering the Pattern, 28 Wm. & Mary L. Rev. 177, 178 (1986). Commentators refer to the act as having the force of an army of private attorneys general. The Authority's attraction to this remedy was a powerful one. First, the statute's civil provisions provide for treble damages and attorney's fees. Second, unlike actions at common law for garden variety fraud, a RICO charge carries with it the stigma of the defendant being labelled a "racketeer."

[3]The complaint also sought injunctive relief under State law prohibiting the nonresident defendants (all of the defendants except Benjamin Burgos and Julio Marin) from entering on or around the development. Interlocutory relief was granted in the form of preliminary injunctions, pursuant to G. L. c. 121B, §§ 32B-32F, as inserted by St. 1989, c. 320. As to defendants Benjamin Burgos and Julio Marin, alleged to reside within the complex, the complaint also alleged that the Authority had the right to possession of their units pursuant to G. L. c. 139, § 19.

ters" by the Authority's witnesses, directed these potential drug purchasers to vendors who were strategically stationed close to trash containers, apparently available for rapid disposal of their wares in the event of a sudden raid. On a typical day, this parade of vehicles lined up at dawn and continued into the night — described on a "good" day as "bumper to bumper." On more than one occasion the Authority's principal witness observed several drug dealers plying their trade simultaneously. Occasionally, turf contests burst into violence.

On the evening of February 19, 1990, officers spied one of the defendants, Charlie Hawkins, involved in two apparent drug deals with the driver of a car. When confronted by the police, he disposed of three bags of marihuana and was arrested. A search of his person turned up eight additional bags. Two days later, the defendants Enrique Cuilon, Luis Torres, and Eugene Britton were observed approaching cars after they entered the development. An "exchange" took place with the occupants of one of those cars. Torres retrieved some material near a dumpster and handed some money to the defendant Palion. All four were arrested; each was found to possess marihuana or to have rapidly disposed of baggies at the officers' approach. Less than a week later, the defendant Edwin Burgos was seen by the police in the same location, with Benjamin Burgos close at hand. Edwin Burgos was arrested and admitted to the officers that he was engaged in selling drugs.

Such was the evidence of persistent, but random, drug trafficking submitted by police witnesses and the Authority's director of housing services, Willie J. Thomas. He added that the Authority's deterrence efforts, in tandem with the Springfield police, had resulted in significant expenses for the hiring of special police officers and lost rental income for those units used for surveillance purposes, as well as frequent expenditures for repair of damaged doors, buzzers, and extra trash collection related to the drug selling activities. Enforcement efforts did little to curtail the unwelcome patronage of drug buyers. The Authority asserted that, consequently, it

had been effectively deprived of the legitimate rental value of its own property. The trial judge, on these facts, taken in a light most favorable to the Authority, found that the Authority failed to establish an "enterprise" such as fell within the activity contemplated under 18 U.S.C. § 1961(4). See *United States* v. *Turkette*, 452 U.S. 576 (1981).

1. *Jurisdiction.* Although the Authority contests the judge's adverse ruling on the enterprise issue (related to its civil RICO claim), it did not include the question of the jurisdiction of the Housing Court over civil RICO claims in its appeal.[4] Even if not briefed, however, it is "the duty of an appellate court to consider a jurisdictional question on its own motion . . . ." *Patry* v. *Liberty Mobilhome Sales, Inc.*, 15 Mass. App. Ct. 701, 704 (1983), S.C. 394 Mass. 270 (1985). See *Litton Bus. Sys.* v. *Commissioner of Rev.*, 383 Mass. 619, 622 (1981). After the date set for oral argument, we recognized that the subject matter jurisdiction issue was of significance and requested a supplemental memorandum on the jurisdictional issue.

The jurisdiction of State courts to adjudicate private claims under the Federal RICO statute remained unresolved until 1990 and had been the subject of litigation in both State and Federal courts. Congress was silent on whether it intended to confer exclusive jurisdiction for § 1962(c) claims on the Federal courts. Ultimately, the United States Supreme Court removed all doubt in *Tafflin* v. *Levitt*, 493 U.S. 455 (1990), in which it held that the language of 18 U.S.C. § 1964(c) made the grant of Federal jurisdiction permissive. The Court continued, "contrary to petitioners' fears, we have full faith in the ability of state courts to handle the complexities of civil RICO actions, particularly since many RICO cases involve asserted violations of state law, such as state

---

[4]The statutory provision authorizing civil RICO claims provides in full: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c) (1988).

fraud claims, over which state courts presumably have greater expertise." *Id.* at 798.

The Legislature has vested the Housing Courts with original jurisdiction over all matters related directly or indirectly to the health, safety, or welfare of any occupant of any place of habitation governed by general or special laws. G. L. c. 185C, § 3.[5] Because the problems associated with drug trafficking in public housing developments have a significant impact on their residents, we think that such contamination' of their living conditions is sufficiently related to health, safety, and welfare of the occupants to come within the Housing Court's jurisdiction. Contrast *Police Commr. of Boston* v. *Lewis*, 371 Mass. 332, 340-341 (1976). Vesting that court with RICO jurisdiction is compatible with the holding in *Tafflin.*

2. *The "enterprise" requirement.* The Authority contends that the testimony presented at trial established that the defendants violated 18 U.S.C. § 1962(c), which provides: "It shall be unlawful for any person employed by or associated with any *enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a *pattern of racketeering activity* or collection of unlawful debt" (emphasis added).

The definition of "racketeering activity" in the RICO statute includes "any act . . . involving . . . dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1) (1988). The statute defines "*enterprise*" as encompassing "any individual, partnership, cor-

[5]Chapter 83 of the Acts of 1988 amended G. L. c. 185C, § 3, such that the jurisdiction of the Housing Court includes "the use of any real property and activities conducted thereon as such use affects the health, welfare and safety of any resident, occupant, user or member of the general public . . . . The divisions of the housing court department shall also have jurisdiction of all housing problems including all contract and tort actions which affect the health, safety and welfare of the occupants or owners thereof . . . ." See also *Boston* v. *Kouns*, 22 Mass. App. Ct. 506 (1986) (tracing the judicial construction of the limited statutory grant of jurisdiction to the Housing Courts prior to the 1988 amendment).

poration, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1988). It defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" within an applicable time period. 18 U.S.C. § 1961(5) (1988). To state a claim under RICO, it must be shown "(1) that a person; (2) conducted the affairs; (3) of an enterprise; (4) through a pattern of racketeering activity." *Norman* v. *Brown, Todd & Heyburn*, 693 F. Supp. 1259, 1263 (D. Mass. 1988).[6]

As the judge noted in his thorough memorandum, it is established that the existence of an "enterprise" is an element of a RICO violation apart from proof of a pattern of racketeering activity in which the enterprise may be engaged. *United States* v. *Turkette*, 452 U.S. at 583. In that case, twelve persons, an alleged "association in fact," were charged with drug distribution along with a number of other criminal acts ranging from fraud and graft to arson. The Court held that the statutory term "enterprise" encompassed illegitimate (or criminal) associations as well as legitimate ones. *Id.* at 587. It also discussed the enterprise requirement. "The enterprise is an entity, . . . a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1) (1976 & Supp. III). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other." 452 U.S. at 583.

---

[6]The Authority submitted in its brief that the issue of pattern was not raised in the appeal since it was implicit that the pattern complained of developed from the defendants' violations of G. L. c. 94C, §§ 32C or 32J, or both.

Decisions in the Federal courts applying the enterprise requirement embody two divergent points of view. The United States Court of Appeals for the Eighth Circuit holds to the more restrictive definition of enterprise, requiring proof of an ascertainable structure or core: "[t]he command system of a Mafia family is an example of this type of structure . . . ." *United States* v. *Bledsoe*, 674 F.2d 647, 665 (8th Cir.), cert. denied, 459 U.S. 1040 (1982). The Eighth Circuit would allow prosecutors to strike hard at organized crime groups but would discourage the use of RICO to pursue less well organized criminal conduct. It holds that "an 'enterprise' must exhibit three basic characteristics: (1) common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering." *United States* v. *Lemm*, 680 F.2d 1193 (8th Cir.), cert. denied, 459 U.S. 1110 (1982), citing *United States* v. *Bledsoe, supra.* The court has suggested a method for determining the distinctness of the enterprise from the pattern: eliminating the predicate acts to see if there was still an ongoing structure. *United States* v. *Lemm*, 680 F.2d at 1200-1201.

The Authority asks, however, that we adopt the interpretation of the Fifth and Eleventh Circuits. It points to *United States* v. *Hewes*, 729 F.2d 1302 (11th Cir. 1984), in which the court rejected the requirement adopted by the Eighth Circuit that there be a definable structure distinct from the racketeering activity and indicated that its leading case remained *United States* v. *Elliott*, 571 F.2d 880, 898 (5th Cir. 1978), cert. denied, 439 U.S. 953 (1985). "Our precedent indicates that a RICO enterprise exists where a group of persons associates, formally or informally, with the purpose of conducting illegal activity." 729 F.2d at 1311. In the *Elliott* case, however, the court found beyond a reasonable doubt the existence of an enterprise which could "best be analogized to a large business conglomerate. Metaphorically speaking, J.C. Hawkins was the chairman of the board, functioning as the chief executive officer and overseeing the operations of many separate branches of the corporation." 571

F.2d at 898. Through this analogy the court focused its analysis on the infrastructure of the organization. In the *Hewes* case, the court analyzed at least a dozen "bust-out schemes," a form of planned bankruptcy in which the operators form a company, defraud creditors, take the company into bankruptcy, and then move on to their next similar operation. Noting that the facts showed that "[t]he participants in these schemes overlapped to a significant degree" and that there existed "a network of interdependent fraud schemes," the court concluded that " '[t]he evidence in this case demonstrated the existence of an enterprise — a myriapod criminal network, loosely connected but connected nonetheless.' " *United States* v. *Hewes*, 729 F.2d at 1311-1312, quoting from *United States* v. *Elliott*, 571 F.2d at 899.

We need not align ourselves with a particular circuit for the purposes of deciding this case. As we read the cases, even under a broader interpretation of enterprise there must be proof of a group of persons associated together for a common purpose of engaging in a course of conduct; there must be some "network," "interdependence," or connection. The Authority's RICO claim was grounded only on evidence of the defendants' pattern of drug distribution at the project. While the evidence did show a pattern — a series of similar episodes on a common turf — and it showed some cooperation among the defendants, it did not warrant a conclusion that an enterprise existed. Even if the legislative scheme of 18 U.S.C. §§ 1961 et seq. were interpreted broadly, as the Authority argues, there is nothing in the record which established an organized, coordinated plan to distribute controlled substances involving the named defendants.[7] We conclude

---

[7]Although it is not necessary to our decision, we further note that, unlike the situation in other cases finding an enterprise, there was no one at the helm — no "chairman of the board." *United States* v. *Elliott*, 571 F.2d at 898. See also *United States* v. *Turkette*, 452 U.S. at 579 ("The common thread to all counts was respondent's alleged leadership of this criminal organization through which he orchestrated and participated in the commission of various crimes"); *United States* v. *Lemm*, 680 F.2d at 1200 ("Gamst provided open, continuous leadership for all three appellants and for the arson ring as a whole"). In *United States* v. *Bledsoe*, 674 F.2d at 667, the court reversed a RICO conviction in part because there

that the Authority has failed to show that the activities carried on at the Sullivan Apartments had a distinct existence separate from the pattern of selling. There was no error in the judge's rulings.

*Judgment affirmed.*

---

was "no real evidence of structure, a pattern of authority or control." Cases (which deal more with a pattern of roles and a continuing system of control) relied on by the Authority do not seem inconsistent with the result we reach given the paucity of such evidence in the present controversy. See *United States* v. *Kragness*, 830 F.2d 842, 856-857 (8th Cir. 1987); *United States* v. *Doherty*, 867 F.2d 47, 68 (1st Cir.), cert. denied, 492 U.S. 918 (1989).